**SAVE MART SUPERMARKETS,**
**Plaintiff,**

v.

**UNDERWRITERS AT LLOYD'S LONDON, Sphere Drake Insurance PLC, and Does 1 through 50, inclusive, Defendants.**

**No. C–93–1025 SAW.**

United States District Court,
N.D. California.

Jan. 27, 1994.

**600**

Pettit & Martin, Charles G. Ehrlich, San Francisco, CA, for plaintiff.

Bryan Marmesh, Vogl & Meredith, San Francisco, CA, Catalina J. Sugayan, Lord, Bissell & Brook, Chicago, IL, for defendants.

## MEMORANDUM AND ORDER

WEIGEL, District Judge.

### I. BACKGROUND.

Save Mart Supermarkets ("Save Mart") is a California corporation which operates several retail stores in Northern California.[1] 1st Am.Compl., ¶ 1. Underwriters at Lloyd's and Sphere Drake Insurance PLC (collectively "the London Defendants")[2] allegedly provided combined Property, Casualty, and Crime Insurance to Save Mart pursuant to Policy No. GHV 1386/190 ("the Policy"), from December 1, 1990, to December 1, 1993.[3] In this action, Save Mart seeks a declaration[4] that it is entitled to coverage under the Policy for costs incurred in connection with *Herring v. Fry's Food and Drug Stores, The Kroger Company, Save Mart*, C–90–3571 (BAC) ("the Herring Action").[5]

### A. The Herring Action.

On April 8, 1988, Barbara Jean Herring, an employee of Fry's Food and Drug Stores ("Fry's"),[6] filed formal charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the California Department of Fair Employment and Housing ("DFEH"). She alleged that Fry's had discriminated against her on the basis of her sex since November, 1978.

In March, 1989, Save Mart purchased certain assets of Fry's from The Kroger Company.[7] On September 14, 1990, Herring received a "right to sue" letter from the EEOC. On December 14, 1990, Herring filed a sex discrimination[8] suit in this Court against Fry's, Save Mart, and The Kroger Company.[9] On March 14, 1991, Herring filed a first amended complaint, adding claims on behalf of all other similarly-situated females at the Fry's stores.

On November 4, 1991, Herring filed a second amended complaint, naming five addi-

---

1. Save Mart does business as: Save Mart Supermarkets, Food Bank, Food 4 Less, Save Mart of Modesto, Fry's Food Stores, and Food Maxx, among others.

2. Lloyd's, an association of Underwriters organized under the laws of the United Kingdom and authorized to do business in California, issued 92.59% of the Policy. Ans. to 1st Am.Compl., ¶ 2. Sphere Drake, an underwriting company organized under the laws of the United Kingdom and authorized to do business in California, issued 7.41% of the Policy. Ans. to 1st Am. Compl., ¶ 3.

3. Save Mart was apparently insured for several years prior to December 1, 1990, by Industrial Indemnity, which is not a party to this lawsuit.

4. Save Mart also seeks compensatory damages under the policy, exemplary damages, attorney's fees and costs.

5. On December 17, 1993, Judge Caulfield issued an Order approving a Class Action Settlement and Consent Decree in the Herring Action.

6. Fry's is a Northern California retail chain, which in 1988 was operated by The Dillon Supermarkets, a wholly-owned subsidiary of an Ohio corporation called The Kroger Company. Herring, 3d Am.Compl., ¶ 11.

7. See supra, footnote 6.

8. Herring's initial complaint stated causes of action under the Civil Rights Act of 1964 and the California Fair Employment and Housing Act.

9. On June 9, 1992, Plaintiffs settled their claims against Defendants Fry's and Kroger. Consent Decree at 2.

tional claimants as representatives of the class,[10] and extending the sex and race discrimination claims to include employees of other Save Mart stores in California. On October 14, 1992, Herring filed a third amended complaint, adding allegations of retaliation and constructive discharge by claimants Alberta and McLemore, and allegations of sex and age discrimination by claimant Olle.

On August 9, 1993, Herring filed a fourth amended complaint, naming individual defendants, and adding allegations of harassment. The parties to this action dispute the propriety and legal effect of the fourth amended complaint.[11]

### B. The Instant Action.

The Policy issued to Save Mart by the London Defendants provides General Liability Coverage for personal injury and property damage with limits of $900,000 ultimate net loss any one occurrence excess of a $100,000 ultimate net loss any one occurrence Self–Insured Retention.[12] The Policy also pro-

vides Faithful Performance Coverage with limits of $475,000 ultimate net loss each and every loss excess of a $25,000 ultimate net loss each and every loss Self–Insured Retention.[13]

The London Defendants denied coverage for the class action sex and race discrimination claims, and reserved all rights as to coverage for the retaliation and age discrimination claims. On March 22, 1993, Save Mart filed the instant action in order to secure coverage under the Policy.

The London Defendants now move for summary judgment on the grounds that: (1) the employment discrimination claims are excluded under Agreement C as personal injuries to "employees of the Assured injured in the course of their employment;" (2) the Herring Action involves solely allegations of intentional misconduct, which are precluded by the terms of the Policy and California Insurance Code § 533; (3) the alleged pattern and practice of discrimination constitutes a single occurrence predating the Poli-

---

**10.** The five additional claimants were: Ellen Starsiak, Lisa Pheil, Marlene Barton, Mari Anna Alberta, and Elnorse McLemore, all current or former employees of Fry's, Kroger and Save Mart.

**11.** See infra, footnote 31.

**12.** SECTION II—CASUALTY INSURANCE—INSURING AGREEMENTS—AGREEMENT C—GENERAL LIABILITY: Underwriters hereby agree, subject to the limitations, terms and conditions hereunder mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability imposed upon the Assured by law or assumed by the Named Assured under contract or agreement, for damages direct or consequential, and expenses, all as more fully defined by the term 'Ultimate Net Loss', on account of personal injuries, including death at any time resulting therefrom, suffered or alleged to have been suffered by any person or persons (excepting employees of the Assured injured in the course of their employment); and/or damage to or destruction of property or the loss of use thereof arising out of any occurrence happening during the period of Insurance.

SECTION II—DEFINITIONS—1. PERSONAL INJURIES—The term 'personal injuries' wherever used herein, shall mean: (a) Bodily Injury, Mental Injury, Mental Anguish, Shock, Sickness Disease, Disability, False Arrest, False Imprisonment, Wrongful Eviction, Detention, Malicious

Prosecution, *Discrimination*, Humiliation, Invasion of Rights of Privacy, Libel, Slander or Defamation of Character, Piracy and any Infringement of Copyright or of Property, Erroneous Service of Civil Papers, Violation of Civil Rights and Disparagement of Property. (emphasis added).

SECTION II—DEFINITIONS—3. OCCURRENCE—The term 'occurrence' wherever used herein shall mean *an accident or a happening or event* or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, or damage to property during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one location shall be deemed one occurrence. (emphasis added).

**13.** Endorsement No. 17. In consideration of the premium charged, it is hereby understood and agreed that the following Insurance Agreement K—Faithful Performance is incorporated in SECTION III—CRIME INSURANCE:

AGREEMENT K—FAITHFUL PERFORMANCE: Underwriters agree, subject to the terms and conditions set forth herein, to indemnify the Assured for loss caused to the Assured through failure of any of the Assured's employees as defined, acting alone or in collusion with others, to perform faithfully his duties or to account properly for all monies and property received by virtue of his position of employment.

cy period; (4) Save Mart is barred from collecting under the Policy because it knew of the discrimination claims prior to the inception of the Policy; and (5) the Faithful Performance Coverage is a first party crime coverage, which is inapplicable to the underlying lawsuit.

Save Mart opposes the London Defendants' motion for summary judgment, and itself moves for a summary adjudication that the London Defendants have a duty to defend the underlying lawsuit and pay defense costs as they are incurred by Save Mart.

## II. *DISCUSSION.*

■■■ Summary judgment is appropriate if there is "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Coverage under a written insurance policy is a matter of judicial interpretation. *Merced Mutual Ins. Co. v. Mendez*, 213 Cal. App.3d 41, 45, 261 Cal.Rptr. 273 (1989). California law controls the construction of the terms of an insurance policy. See *St. Paul Mercury Ins. Co. v. Ralee Engineering Co.*, 804 F.2d 520, 522 (9th Cir.1986).

### A. *Save Mart's Counter Motion for Summary Judgment.*[14]

■■■ **1. Duty to Defend.** If an insurer has a duty to defend, it must defend any suit

potentially seeking damages within the coverage of the insurance policy. *Montrose Chemical Corp. v. Superior Court*, 6 Cal.4th 287, 295, 24 Cal.Rptr. 467, 861 P.2d 1153 (1993) (citing *Gray v. Zurich*, 65 Cal.2d 263, 275, 54 Cal.Rptr. 104, 419 P.2d 168 (1966)). A policy which does not contain an express duty to defend should nevertheless be interpreted to include a duty to defend unless a contrary intention appears.[15] Cal.Civ.Code § 2778(4).

■■■ The duty to defend must be "negated by language clear enough to meet the requirement of *Gray v. Zurich* [citation omitted] that 'any exception to the performance of the underlying obligation must be so stated as clearly to apprise the insured of its effect.'" *Mt. Hawley Ins. Co. v. F.D.I.C.*, 695 F.Supp. 469, 474 (C.D.Cal.1987). A clause granting the insurer the option of conducting a defense indicates a contrary intent. See *Id.* (citing *Gribaldo v. Agrippina*, 3 Cal.3d 434, 448, 91 Cal.Rptr. 6, 476 P.2d 406 (1970)).

Save Mart acknowledges that the Policy does not contain an explicit duty to defend. But, it argues that because the instant Policy expressly requires the London Defendants to reimburse Save Mart for defense costs,[16] and specifically states that Defendants may associate in the defense of an action,[17] the Lon-

---

**14.** The Court first considers Plaintiff's Counter Motion for Summary Judgment, which addresses the Duty to Defend and to Pay Defense Costs. The Court then turns to Defendants' Motion for Summary Judgment, which addresses the Duty to Indemnify.

**15.** California Civil Code § 2778 provides:
In the interpretation of a contract of indemnity, the following rules are to be applied, unless a contrary intention appears:
. . . . 4. The person indemnifying is bound, on request of the person indemnified, to defend actions or proceedings brought against the latter in respect to the matters embraced by the indemnity, but the person indemnified has the right to conduct such defenses, if he chooses to do so.

**16.** SECTION II—DEFINITIONS—4. ULTIMATE NET LOSS—The term 'Ultimate Net Loss' shall mean the total sum which the Assured becomes obligated· to pay by reason of personal injury or property damage claims, either through adjudication or compromise, after making proper deductions for all recoveries and salvages, and

shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensations, fees, charges and *law costs*, premiums on attachments or appeal bonds, interest, *expenses for* doctors, *lawyers*, nurses and investigators and other persons *and for litigation, settlement, adjustment and investigation of claims* and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Named Assured's permanent employees . . . (emphasis added).

**17.** SECTION IV—GENERAL CONDITIONS—12. CLAIMS: The Assured shall immediately notify Underwriters through Gallagher Bassett Services, Inc. of any occurrence, the cost of which is likely to result in payment by Underwriters under this Insurance. *Underwriters shall have the opportunity to be associated with the Assured in defense of any claims*, suits or proceedings relative to an occurrence wherein the opinion of the Underwriters, their liability under this Insurance is likely to be involved, in which case the Assured and Underwriters shall cooper-

don Defendants have a statutory duty to defend. Save Mart's conclusion does not follow from its premise.

■ An insurer may assume a duty to reimburse for defense costs without assuming a duty to defend. See *Gon v. First State Ins. Co.*, 871 F.2d 863, 868 (9th Cir.1989). Therefore, an obligation to reimburse is not determinative of an obligation to defend. More importantly, the London Defendants' explicit *option* to join in the defense directly contradicts any possible *duty* to join in the defense. Under the terms of the Policy, therefore, the London Defendants do not have a duty to defend under Cal.Civ.Code § 2778(4), because a contrary intention appears.

Accordingly, Save Mart's Counter Motion for Summary Judgment Re: Duty to Defend must be denied.

■ **2. Payment of Defense Costs.** A liability policy provides coverage for a loss which the insured becomes legally obligated to pay, whereas an indemnity policy provides coverage only for those losses actually paid out by the insured.[18] If an insurer has an obligation to pay defense costs under a liability policy, as opposed to an indemnity policy, the insurer must pay the costs as they are incurred. *Gon,* 871 F.2d at 868; *Okada v. MGIC Indem. Corp.,* 823 F.2d 276, 280 (9th Cir.1986).

■ Save Mart argues that the instant policy is a liability policy, and the London Defendants are therefore obligated to pay defense costs as they are incurred. The terms of the Policy and the relevant case law do not support Save Mart's contention.

The Policy expressly defines Ultimate Net Loss to include law costs, and expenses for lawyers, litigation and settlement.[19] The issue is when the London Defendants become liable for those costs. The answer is contained in the Policy itself:

> SECTION IV—GENERAL CONDITIONS—13. LOSS PAYMENTS: When it has been determined that Underwriters are liable under this Insurance, Underwriters shall *thereafter* promptly *reimburse* the Assured for all *payments made* ... All adjusted claims shall be paid ... to the Assured within thirty days after the presentation to and acceptance by Underwriters of satisfactory proof of interest and loss. (emphasis added).

When read in conjunction with other relevant provisions of the Policy, this section indicates an agreement of indemnity rather than liability.[20] Save Mart has introduced no extrinsic evidence supporting an alternate interpretation, and the cases Save Mart cites are distinguishable.[21]

Under the terms of the Policy, therefore, the London Defendants have an obligation to pay defense costs as a portion of ultimate net loss only if and when there is a determination

---

ate to the mutual advantage of both. (emphasis added).

**18.** "In a liability contract, the insurer agrees to cover liability for damages. If the insured is liable, the insurance company must pay the damages. In an indemnity contract, by contrast, the insurer agrees to reimburse expenses to the insured that the insurer [sic] is liable to pay and has paid." *Okada v. MGIC Indemnity Corp.,* 823 F.2d 276, 280 (9th Cir.1986) (quoting *Continental Oil Co. v. Bonanza Corp.,* 677 F.2d 455, 459 (5th Cir.1982)).

**19.** See supra, footnote 16.

**20.** For example, by subsuming defense costs in "ultimate net loss," the Policy clearly contemplates payment for defense costs after the underlying conflict is resolved. See supra, footnote 16, for full text. The London Defendants' agreement

to "indemnify" Save Mart for all sums it is obligated to pay by reason of liability imposed upon it, also suggests post-judgment reimbursement. See supra, footnote 12, for full text.

**21.** The *Okada* Policy required the insurer to pay any loss "on behalf of" the insured, and the *Gon* Policy was apparently substantively identical. *Okada,* 823 F.2d at 278; *Gon,* 871 F.2d at 868. The *Mt. Hawley* policy not only contained "pay on behalf of" language, but required the insured to secure the consent of the insurer before expending any costs for a defense. *Mt. Hawley Ins. v. Federal Sav. & Loan Ins. Corp.,* 695 F.Supp. 469, 474–76 (C.D.Cal.1987). The instant Policy contains some language similar to that found in *Gon, Okada,* and *Mt. Hawley,* such as referring to costs the insured shall be "obligated to pay." But here, the Policy specifies indemnity and reimbursement, and expressly requires payment only after a determination of liability under the policy.

that the underlying action is covered under the Policy. Accordingly, Save Mart's Counter Motion for Summary Judgment Re: Defense Costs must be denied.

### B. The London Defendants' Motion for Summary Judgment.

**1. The Employee Exception.** Under California law, whether a written contract is ambiguous is a question of law to be decided by the Court. *United States, etc. v. National Bonding & Accident Ins.*, 711 F.2d 131, 133 (9th Cir.1983) (citing *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866 (9th Cir.1979)). Even if contract language is clear and unambiguous on its face, a court must receive relevant extrinsic evidence which can help prove a meaning to which the contract language is reasonably susceptible. *National Bonding*, 711 F.2d at 133. Only if the court finds, after considering the preliminary evidence, that the contract is not reasonably susceptible of interpretation may the case be disposed of on summary judgment. *Brobeck*, 602 F.2d at 871–72 (applying California law).

The London Defendants argue that the employment discrimination claims are excluded under Agreement C of the Policy because they constitute personal injuries to "employees of the Assured injured in the course of their employment." [22] On its face, the Policy language is subject to more than one reasonable interpretation. The Clause could be read, as the London Defendants urge, to exclude all claims, including discrimination claims,[23] by employees injured on the job. Alternatively, the Clause could be construed to bar only those claims which would otherwise arise under Worker's Compensation Laws. This interpretation finds support in the phrase "injured in the course of [ ] employment," and the separate provision under the Policy for Worker's Compensation coverage.[24]

Even if the contract were not facially ambiguous, extrinsic evidence would render it reasonably susceptible of an interpretation other than that espoused by the London Defendants. For example, in marketing the Policy to Save Mart, Lloyd's warranted that the Policy provided "[t]he broadest general liability coverage available (only fire exclusions and full 'discrimination' coverage)." Silveira Decl., Exh. A (Option I, Program Review, Lloyd's of London). If the Policy were interpreted to exclude discrimination claims by employees, that would arguably run counter to Lloyd's guarantee of "full discrimination coverage."

Moreover, a statement in a letter between two insurance brokers directly controverts the London Defendants' interpretation of the Clause. "[T]he exception to employees of the insured under the Casualty Insurance Agreement 'C' relates to injuries that would be covered under Worker's Compensation. The allegations of discrimination and mental anguish ... are covered under the London Personal Injury Endorsement." Basset Letter, Ehrlich Decl., Exh D. The parties dispute the agency relationship of the brokers to the parties, and hence the legal effect of the comment.[25]

The "employee exception" clause is ambiguous, and there are genuine issues of material fact surrounding its interpretation. Accordingly, the London Defendants are not entitled to summary judgment as to coverage based on the "employee exception."

---

**22.** See supra, footnote 12.

**23.** The Policy defines "personal injury" to include discrimination. See supra, footnote 12.

**24.** Save Mart, apparently elected not to obtain this additional coverage.

**25.** The comment was apparently made by Thomas Kraus of Gallagher Basset Services in a letter addressed to Barry Walland of Gallagher Plumer, Ltd. The comment is contained in a "blind post-script" to Mr. O'Donnel of Gallagher Bassett. The London Defendants claim that Galla-

gher Bassett was a claims administrator for Save Mart and the comment was therefore made by an agent of Save Mart advocating Save Mart's position. Save Mart counters that Lloyd's has presented the Gallagher entities as agents of Lloyd's for other purposes, and it therefore should not be able to deny their agency status in this context. Save Mart points out, for example, that the London Defendants have insisted that their own communications with Gallagher Bassett and Gallagher Plumer are protected by the attorney client privilege. Ehrlich Decl., Exh. E.

**2. Intentional Misconduct.** An insurance policy which defines an "occurrence" as an "accident," excludes coverage for intentional conduct. *United Pacific Ins. Co. v. McGuire Co.*, 229 Cal.App.3d 1560, 1564, 281 Cal.Rptr. 375 (1991). However, an insurance policy which defines "occurrence" to include "events," has been held to cover intentional conduct. *Id.* at 1565, 281 Cal. Rptr. 375. Under the Lloyd's Policy, an occurrence consists of "an accident or a happening or event ... which unexpectedly and unintentionally results in personal injury ..." [26] Accordingly, the Lloyd's Policy covers intentional acts which cause unintended harm.

Regardless of the express language of a policy, California Insurance Code § 533 establishes an implied exclusionary clause which must be read into every insurance agreement.[27] Section 533 provides that "[a]n insurer is not liable for a loss caused by the wilful act of the insured ..." Cal.Ins. Code § 533. The purpose of § 533 is to discourage wilful torts. *J.C. Penney Casualty Ins. Co. v. M.K., a minor*, 52 Cal.3d 1009, 1021, 278 Cal.Rptr. 64, 804 P.2d 689 (1991). Case law construing § 533 has focused on the definition of the term 'wilful.'

Save Mart argues that all of the discrimination claims in this case should be covered by the Policy because the London Defendants have failed to show that Save Mart acted with 'a preconceived design to inflict injury.' The London Defendants argue that none of the claims should be covered under the Policy because the claims are solely for intentional discrimination, and in any event, all forms of employment discrimination are wilful as matter of law under § 533. Both parties overstate their cases.

In *Clemmer v. Hartford Ins. Co.*, 22 Cal.3d 865, 887, 151 Cal.Rptr. 285, 587 P.2d 1098 (1978), the California Supreme Court held that § 533 precludes coverage only where the insured acts with "a preconceived design to inflict injury." The Court later explained that the "preconceived design" language in *Clemmer* referred to the insured's mental capacity to commit the wrongful act. *J.C. Penney*, 52 Cal.3d at 1023, 278 Cal.Rptr. 64, 804 P.2d 689. The Court held in *J.C. Penney* that the insurer need not show that the insured acted with a preconceived design to injure when the insured seeks coverage for an intentional and wrongful act, and the harm is inherent in the act itself. *Id.* at 1025, 278 Cal.Rptr. 64, 804 P.2d 689 (child molestation). Save Mart's reliance on the preconceived design test is therefore misplaced.[28] Under *J.C. Penney*, if an act is inherently harmful, § 533 requires only a showing of intent to engage in the harmful conduct to preclude coverage. See *J.C. Penney*, 52 Cal.3d at 1021, 1025, 1026, 278 Cal. Rptr. 64, 804 P.2d 689.

Since *J.C. Penney*, courts have found several acts to be inherently harmful, and hence precluded from coverage under § 533 when intentionally committed. *Aetna Cas. and Sur. Co. v. Superior Court*, 19 Cal.App.4th 320, 23 Cal.Rptr.2d 442 (1993) (knowing inducement of patent infringement); *Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co.*, 14 Cal.App.4th 1595, 18 Cal.Rptr.2d 692 (1993) (sexual harassment); *California Cas. Mgt. Co. v. Martocchio*, 11 Cal.App.4th 1527, 15 Cal.Rptr.2d 277 (1993) (malicious prosecution); *Fire Ins. Exchange v. Altieri*, 235 Cal.App.3d 1352, 1 Cal.Rptr.2d 360 (1991) (assault by child of insured); *Aetna Cas. and Sur. Co. v. Sheft*, 989 F.2d 1105 (9th Cir. 1993) (intentional exposure of sexual partner to AIDS virus); *Trailer Marine Transp. Corp. v. Chicago Ins. Co.*, 791 F.Supp. 809 (1992) (knowingly conspiring to unlawfully restrain trade); *Allstate Ins. Co. v. Tankovich*, 776 F.Supp. 1394 (1991) (racially motivated hate crimes); *State Farm Fire and*

---

26. See supra, footnote 12, for full text.

27. Because § 533 reflects fundamental public policy, parties to an insurance policy cannot contract out from under its terms. *J.C. Penney Casualty Ins. Co. v. M.K., a minor*, 52 Cal.3d 1009, 1019, n. 8, 278 Cal.Rptr. 64, 804 P.2d 689 (1991).

28. Save Mart relies heavily on *Republic Indem. Co. v. Superior Court*, 224 Cal.App.3d 492, 273 Cal.Rptr. 331 (1990) (applying preconceived design test to employment discrimination claims), which was seriously undermined by *J.C. Penney*. *B & E*, 8 Cal.App.4th at 96, 9 Cal.Rptr.2d 894.

*Cas. Co. v. Ezrin,* 764 F.Supp. 153 (1991) (sexual assault by child of insured).

One recent California case has specifically addressed the issue of employment discrimination and § 533. In *B & E Convalescent Center v. State Comp. Ins. Fund,* 8 Cal.App. 4th 78, 9 Cal.Rptr.2d 894 (1992), the court held that coverage for wrongful termination in violation of the Labor Code and antidiscrimination statutes was precluded under § 533. "[I]t can hardly be denied that a termination from employment in violation of antidiscrimination statutes or other fundamental and substantial public policies is inherently harmful." *B & E,* 8 Cal.App.4th at 98, 9 Cal.Rptr.2d 894. The factual record before the court clearly indicated that the employer had intended to discriminate against the employee because of her race and her union activities. *B & E,* 8 Cal.App.4th at 95, 9 Cal.Rptr.2d 894. Therefore, the employer was not entitled to indemnity under its general liability policy.

▮ The London Defendants rely on a line of cases outside the § 533 context to argue that employment discrimination is not only always wrongful, but always intentional, under § 533. The London Defendants' reasoning is not persuasive. The cases they cite construe policy language, and stand for the proposition that an act of discrimination cannot be considered an "accident." See *Loyola Marymount v. Hartford Acc. and Indem.,* 219 Cal.App.3d 1217, 1224–25, 271 Cal.Rptr. 528 (1990); *Commercial Union Ins. Co. v. Superior Court,* 196 Cal.App.3d 1205, 1208, 242 Cal.Rptr. 454 (1987); *American Guaranty & Liability v. Vista Medical Supply,* 699 F.Supp. 787, 790 (N.D.Cal.1988). Whether an employer fires an employee with a dis-

criminatory motive, or establishes a facially neutral employment policy which has the unintended effect of discriminating among employees, the employer is engaging in an "intentional" act as opposed to an "accidental" one. The inquiry under § 533, however, is whether the insured intended to engage in conduct that is wrongful. In all the post-*J.C. Penney* cases enumerated above, there was an inherently wrongful act and an insured who intentionally engaged in that act.

▮ The issue before this Court is whether claims of disparate impact (unintentional), as well as disparate treatment (intentional), discrimination are barred from coverage by § 533.[29] Although *B & E* did not reach this question, the language and policy of § 533, and the case law arising under it, dictate the answer. Unintentional discrimination may be inherently harmful, but a plaintiff need not establish that the insured intended to commit a wrongful act in order to recover under such a theory. Therefore, the standard set forth in *J.C. Penney*[30] would not be met, and the policy of discouraging wilful torts would not be furthered, if coverage for unintentional discrimination were barred under § 533. Accordingly, this Court will not take the extraordinary step advocated by the London Defendants. Unlike disparate treatment claims, disparate impact claims are not precluded from coverage under § 533.

▮ The critical question here is how to characterize the claims in the underlying action. The parties dispute whether the Third Amended Complaint or the Fourth Amended Complaint is the "operative pleading" in the Herring Action.[31] The London Defendants

---

29. Under a disparate treatment theory, a plaintiff must show that the employer intentionally discriminated, whereas under a disparate impact theory, a plaintiff need only show that facially neutral employment policies in fact adversely affected a protected group. See *Griggs v. Duke Power,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

30. In *J.C. Penney* the record clearly revealed that the insured intended to molest the child. It was the insured's subjective intent to harm the child that the Court found irrelevant. Similarly in the employment discrimination context, it must be shown that the insured intended to discriminate,

but not that he intended to harm the victim of discrimination.

31. The London Defendants filed an Objection to Admissibility of Evidence, demanding that all Save Mart's references to the Fourth Amended Complaint be stricken because that Complaint was never served and would never be answered because of the impending settlement. Objection at 2. Elsewhere, they claim that "[t]he history of the fourth amended complaint ... show[s] ... that Save Mart and its attorneys know full well that the employee discrimination claims alleged in the operative complaint in the *Herring* action are not covered under the Policy. Reply at 4.

at least implicitly charge collusion between Save Mart and the Herring Plaintiffs in crafting the Fourth Amended Complaint. This factual issue is material because as Save Mart acknowledges, there are express allegations of disparate impact, as opposed to disparate treatment, only in the Fourth Amended Complaint.[32] Reply re: Counter Motion at 13.

In light of the foregoing, the London Defendants are not entitled to a summary judgment that all the claims in the Herring Action are for intentional misconduct, and are barred by either the Policy language or § 533.

**3. Number and Date of Occurrences.** The Lloyd's Policy provides that "exposure to substantially the same general conditions existing at or emanating from one location shall be deemed one occurrence."[33] The London Defendants urge the Court to find as a matter of law that the alleged pattern and practice of discrimination constituted a single occurrence predating the Policy period.

The Herring Action involves sex, race, and age discrimination claims based on conduct which allegedly took place in various departments of various stores on various occasions, both before and during the Policy period. In order to determine the number and date of "occurrences" precipitated by the underlying conduct, the Court would be required to weigh evidence and make factual findings.[34] Accordingly, summary judgment is inappropriate.

**4. Prior Knowledge of Save Mart.** Insurance is designed to protect against unknown or contingent risks of harm, not known or expected losses. *Chemstar, Inc. v.* *Liberty Mutual Ins. Co.*, 797 F.Supp. 1541, 1551 (C.D.Cal.1992).

Herring filed her initial Charge of Discrimination on April 8, 1988; Save Mart acquired Fry's Assets on March 29, 1989; Herring received a right to sue letter from the EEOC on September 14, 1990; and the Lloyd's Policy went into effect on December 1, 1990. Based on this sequence of events, the London Defendants argue that Save Mart had prior knowledge of the discrimination claims, rendering them known risks outside the scope of the Policy. Save Mart responds with declaratory evidence that Save Mart was not in fact aware of the Herring charges against Fry's prior to the inception of the Policy. Zalatel Decl., Exh. L, M, N (Alexander, Bacon, Sauer). Save Mart alternatively argues that knowledge of the claims against Fry's would not constitute knowledge of claims against Save Mart.[35]

The London Defendants have not established as a matter of law that Save Mart had knowledge of the discrimination claims prior to the inception of the Policy period. Accordingly, summary judgment is inappropriate.

**5. Faithful Performance Coverage.** A contract of insurance must be read as a whole, including any introductory clause or heading, to determine the intent of the parties. *Ogburn v. Travelers Ins. Co.*, 207 Cal. 50, 52–53, 276 P. 1004 (1929).

Endorsement 17 to the Lloyd's Policy, entitled "Faithful Performance," is incorporated into "SECTION III—CRIME INSURANCE." The clause provides indemnity for loss caused by the failure of an employee "to perform faithfully his duties or to account properly for all monies and property received by virtue of his position of employment."[36]

---

**32.** The status of the Fourth Amended Complaint is also relevant to the interpretation of the "employee exception" clause because apparently only the Fourth Amended Complaint includes allegations by nonemployees.

**33.** See supra, footnote 12, for full text.

**34.** For example, the Court must determine whether Save Mart's discriminatory practices were simply a continuation of Fry's discriminatory practices. And, the Court must determine whether Save Mart's discriminatory acts derived from a single overarching employment policy, or from multiple, distinct policies.

**35.** Save Mart was not named as a defendant until Herring's initial complaint was filed December 14, 1990, after the inception of the Lloyd's Policy.

**36.** See supra, footnote 13, for full text.

608

Ultimate net loss under the Crime Insurance Section is defined as "the actual loss sustained by the Assured after making deductions for all recoveries and salvages."

Read as a whole, this clause clearly contemplates indemnification for monetary or property loss caused by the misconduct of an employee. The underlying complaint in this case alleges discriminatory employment policies not employee misconduct, and any cost to the Assured will result from liability imposed by law [37] not loss of money or property. Accordingly, the London Defendants are entitled to a summary adjudication that the discrimination claims are not covered by the Faithful Performance Clause.

Accordingly, IT IS HEREBY ORDERED that:

(1) The London Defendants' Motion for Summary Judgment is DENIED, except as to the Faithful Performance Provision. As to that provision only, the Defendants' Motion for Summary Judgment is GRANTED.

(2) Save Mart's Counter Motion for Summary Judgment is DENIED.

---

**37.** See supra, footnote 12.