## USF INSURANCE COMPANY
Plaintiff,

v.

## CLARENDON AMERICA INSURANCE COMPANY, Clarendon National Insurance Company, and Does 1 through 20, inclusive, Defendants.

### No. 05CV04138 MMMRZX.

United States District Court,
C.D. California.

Feb. 16, 2006.

974

James F. Weintre, Judith A. Blick, Keith R. Denny, Mark A. Poppett, Susan J. Gill, Blick and Rhoades, San Diego, CA, for Plaintiff.

David S. Blau, David S. Blau Law Offices, Los Angeles, CA, for Defendants.

## AMENDED ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MORROW, District Judge.

This action involves a dispute between insurance carriers regarding their duties

in connection with *Alvizuri, et al. v. Field-stone Communities Inc., et al.*, Orange County Superior Court Case No. 03CC00227 (the "Underlying Action"). In *Alvizuri*, the owners of more than one hundred single-family dwellings sued, *inter alia*, Hondo Construction & Development, Inc. for damages resulting from alleged construction defects. On May 5, 2005, USF Insurance Company filed this action in Los Angeles Superior Court against Clarendon America Institute Company ("Clarendon America") and Clarendon National Insurance Company ("Clarendon National"), alleging that defendants had wrongfully refused to participate in the defense and indemnification of Hondo in the Underlying Action. USF sought (1) a declaration that defendants had a duty to defend Hondo in the Underlying Action; (2) a declaration that defendants had a duty to indemnify Hondo in the Underly-

ing Action; (3) equitable contribution of an equal share of the defense costs USF paid in the Underlying Action; and (4) a declaration apportioning any indemnity obligation owed by the insurers in connection with the Underlying Action.

Defendants removed the action to federal court on June 8, 2005. On October 3, 2005, they filed a motion for summary judgment, or, alternatively, partial summary judgment on USF's first and third causes of action. That same day, USF filed its own motion for summary judgment or partial summary judgment.

## I. FACTUAL BACKGROUND

### A. Underlying Action

▮▮▮▮ *Alvizuri v. Fieldstone Communities Inc.*, the Underlying Action that gives rise to this dispute, was filed in state court on June 20, 2003.[1] A group of 49 plain-

---

1. Stipulation of Facts in Support of Cross–Motions for Summary Judgment and/or Adjudication ("Fact Stip."), ¶ 1. See Clarendon America Insurance Company's Statement of Uncontroverted Facts in Support of Motion for Summary Judgment or, in the Alternative Summary Adjudication ("Defs.' Facts"), ¶ 1; Statement of Genuine Issues in Opposition to Clarendon's Motion for Summary Judgment, or in the Alternative for Summary Adjudication as to Plaintiff's First and Third Causes of Action ("Pl.'s Genuine Issues"), ¶ 1.

USF requests that the court take judicial notice of the pleadings in the Underlying Action, and defendants do not object. (See Request for Judicial Notice of Pleadings in Underlying Action in Considering the Parties' Cross–Motions for Summary Judgment; Stipulation re Mutual Waiver/Withdrawal of Certain Evidentiary Objections to Documents Offered by Each Side in Support of the Cross–Motions for Summary Judgment/Summary Adjudication ("Evid.Stip."), ¶ 3.) The court "may take judicial notice of a document filed in another court not for the truth of the matters asserted in the litigation, but rather to establish the fact of such litigation and related filings." *San Luis v. Badgley*, 136 F.Supp.2d 1136, 1146 (E.D.Cal.2000) (quoting *United States v. Jones*, 29 F.3d 1549, 1553 (11th

Cir.1994)); see *Biggs v. Capital Factors, Inc.*, 120 F.3d 268, 1997 WL 415340, *1–2 (9th Cir. July 22, 1997) (Unpub.Disp.) ("[A]lthough a court may take judicial notice of its own records, it cannot take judicial notice of the truth of the contents of all documents found therein"); *Hill v. Goord*, 63 F.Supp.2d 254, 256 (S.D.N.Y.1999) ("It also is entirely proper for this Court to take judicial notice of the actions taken in these related proceedings 'to establish the fact of such litigation and related filings,'" citing *Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir.1992), and *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir.1991)). Because USF's request is limited to the fact of the pleadings, and not the truth of their contents, the court finds that judicial notice is proper. (See Declaration of Jeffrey S. Behar in Support of USF Insurance Company's Opposition to Clarendon's Motion for Summary Judgment, or in the Alternative, for Summary Adjudication of the Plaintiff's First and Third Causes of Action ("Behar Decl."), Exh. O (*Alvizuri v. Fieldstone Communities Inc.*, Complaint for Damages, filed June 20, 2003), Exh. P (First Amended Complaint for Damages, filed July 21, 2003), Exh. Q (Second Amended Complaint for Damages, filed September 8,

tiffs—each of whom owned a single-family home in Rancho Santa Margarita, California—sued Fieldstone Communities, Inc. and other developers, designers, and contractors involved in building the houses for alleged design and construction defects.[2] Plaintiffs alleged that

> "[a]t the time of the purchase by Plaintiffs, the PROPERTY was defective and unfit for its intended purposes because Defendants did not construct the PROPERTY in a workmanlike manner as manifested by, but not limited to, numerous defects which have resulted in damage to the homes and their component parts. The defects include, without limitations and to various degrees on the plaintiffs' respective residences, the following:

> Faulty soil compaction, faulty existing underlying soils and expansive soils resulting in soil movement and damage to the structures; concrete slabs, flatwork and foundation defects; plumbing defects; electrical defects; drainage defects; roof defects; HVAC defects; waterproofing defects; window and door defects; landscaping and irrigation defects; framing, siding and structural defects; ceramic tile, vinyl flooring and countertop defects; drywall defects; fence and retaining wall defects; cabinet and wood trim defects; fireplace and chimney defects; tub and shower door defects; painting defects; sheet metal defects; and stucco defects." [3]

Plaintiffs asserted that these defects were not apparent by reasonable inspection of the property at the time of purchase, and that it was only afterwards that "[t]he defects ... manifested." [4] They alleged that they had become aware of the defects only within the prior three years, and that they had given the developers timely notice of the defects upon discovery.[5]

Based on these allegations, plaintiffs asserted claims for strict products liability, breach of implied warranty, breach of express warranty, breach of contract, negligence, and negligence per se.[6] They

---

2003), Exh. R (Third Amended Complaint for Damages, filed Nov. 26, 2003), Exh. S (Fourth Amended Complaint for Damages, filed January 22, 2004); Exh. T (Fifth Amended Complaint for Damages, filed March 2, 2004).)

**2.** Behar Decl., Exh. O (Complaint for Damages, ¶¶ 1–9), Exh. P (First Amended Complaint for Damages, ¶¶ 1–9), Exh. Q (Second Amended Complaint for Damages, ¶¶ 1–9), Exh. R (Third Amended Complaint for Damages, ¶¶ 1–9), Exh. S (Fourth Amended Complaint for Damages, ¶¶ 1–9), Exh. T (Fifth Amended Complaint for Damages, ¶¶ 1–9).

**3.** *Id.,* Exh. O (Complaint for Damages, ¶ 15), Exh. P (First Amended Complaint for Damages, ¶ 15), Exh. Q (Second Amended Complaint for Damages, ¶ 15), Exh. R (Third Amended Complaint for Damages, ¶ 15), Exh. S (Fourth Amended Complaint for Damages, ¶ 15), Exh. T (Fifth Amended Complaint for Damages, ¶ 15).

**4.** *Id.,* Exh. O (Complaint for Damages, ¶ 18), Exh. P (First Amended Complaint for Damages, ¶ 18), Exh. Q (Second Amended Complaint for Damages, ¶ 18), Exh. R (Third Amended Complaint for Damages, ¶ 18), Exh. S (Fourth Amended Complaint for Damages, ¶ 18), Exh. T (Fifth Amended Complaint for Damages, ¶ 18).

**5.** *Id.,* Exh. O (Complaint for Damages, ¶ 17), Exh. P (First Amended Complaint for Damages, ¶ 17), Exh. Q (Second Amended Complaint for Damages, ¶ 17), Exh. R (Third Amended Complaint for Damages, ¶ 17), Exh. S (Fourth Amended Complaint for Damages, ¶ 17), Exh. T (Fifth Amended Complaint for Damages, ¶ 17).

**6.** *Id.,* Exh. O (Complaint for Damages, ¶¶ 10–54), Exh. P (First Amended Complaint for Damages, ¶ 18), Exh. Q (Second Amended Complaint for Damages, ¶¶ 10–54), Exh. R (Third Amended Complaint for Damages, ¶¶ 10–54), Exh. S (Fourth Amended Complaint for Damages, ¶¶ 10–54), Exh. T (Fifth Amended Complaint for Damages, ¶¶ 10–54).

prayed for (1) costs of restoration and repairs to the homes in excess of $150,000 per home; (2) costs of investigation; (3) damages for diminution of value of the property; (4) attorneys' fees, expert fees, and costs of suit; (5) damages for loss of use of the property and relocation expenses; and (6) other appropriate relief.[7]

The complaint was amended multiple times after June 20, 2003 to join more plaintiffs. The fifth amended complaint, filed March 4, 2004, was the final operative pleading.[8] It alleged that 127 single-family homes in Rancho Santa Margarita were defective.[9]

The complaint and amended complaints asserted claims for negligence and negligence per se against Hondo,[10] which had framed, or performed rough carpentry on, 90 of the 127 homes.[11] Plaintiffs alleged that defendants' carelessness and negligence in performing the construction work, as well as their failure to comply with applicable building codes, proximately caused the defects and other unspecified damage to their property.[12] It is undis-

---

**7.** *Id.*, Exh. O (Complaint for Damages at 11–12), Exh. P (First Amended Complaint for Damages at 15), Exh. Q (Second Amended Complaint for Damages at 15), Exh. R (Third Amended Complaint for Damages at 16), Exh. S (Fourth Amended Complaint for Damages at 16), Exh. T (Fifth Amended Complaint for Damages at 16).

**8.** Defs.' Facts, ¶ 2; Pl.'s Genuine Issues, ¶ 2.

**9.** See Behar Decl., Exh. T (Fifth Amended Complaint for Damages).

**10.** Hondo was not named as a defendant in the original complaint or the subsequent amendments. On December 10, 2003, however, the named defendants filed a cross-complaint against other entities that had participated in constructing the Rancho Santa Margarita homes, including Hondo. (See Declaration of Jon T. Moseley ("Moseley Decl."), Exh. B (Cross–Complaint of Fieldstone Communities, Inc., The Fieldstone Company, Fieldstone Trabuco Partners, Rancho Trabuco Partners I, L.P., Rancho Trabuco Partners II, L.P. and Rancho Trabuco III, L.P., filed Dec. 10, 2003). On April 23, 2004, plaintiffs amended their complaint to name Hondo as "Doe 235." (See Moseley Decl., Exh. C (Doe Amendment, filed Apr. 23, 2004).) As "Doe 235," Hondo was considered a "Contractor Defendant," as that term was defined in the complaint and amendments. (See, e.g., Behar Decl., Exh. T (Fifth Amended Complaint for Damages, ¶ 8 ("In order to build and construct said project the DEVELOPER DEFENDANTS hired, retained, employed, or contracted with persons or entities to provide for labor and materials in the construction of the PROPERTY and

project(s). The identities of said persons or entities, whether individual, corporate, or otherwise, sued herein as Does 201 through 300 are presently unknown to Plaintiffs who therefore sue such persons by their fictitious names. Plaintiffs are informed and believe and thereon allege that said persons or entities are wholly or in some part responsible for the occurrences set for[th] in the Complaint. These Defendants will hereinafter be referred to as the 'CONTRACTOR DEFENDANTS' ").)

**11.** Fact Stip., ¶ 10; see Supplemental Stipulation of Facts in Support of Cross–Motions for Summary Judgment and/or Adjudication ("Supp. Fact Stip."), ¶¶ 2, 3, Exh. 1 (listing the 90 homes included in the Underlying Action for which Hondo performed framing work); see also Defs.' Facts, ¶ 9; Pl.'s Genuine Issues, ¶ 9; Separate Statement of Uncontroverted Facts in Support of USF Insurance Company's Motion for Summary Judgment, or in the Alternative Summary Adjudication ("Pl.'s Facts"), ¶ 5.0; Clarendon America Insurance Company and Clarendon National Insurance Company's Statement of Genuine Issues in Support of Opposition to USF's Motion for Summary Judgment/Adjudication ("Defs.' Genuine Issues"), ¶ 5.0.

**12.** Behar Decl., Exh. O (Complaint for Damages, ¶¶ 39–43, ¶¶ 44–47), Exh. P (First Amended Complaint for Damages, ¶¶ 39–43, ¶¶ 44–47), Exh. Q (Second Amended Complaint for Damages, ¶¶ 39–43, ¶¶ 44–47), Exh. R (Third Amended Complaint for Damages, ¶¶ 39–43, ¶¶ 44–47), Exh. S (Fourth Amended Complaint for Damages, ¶¶ 39–43, ¶¶ 44–47), Exh. T (Fifth Amended Complaint for Damages, ¶¶ 39–43, ¶¶ 44–47).

puted that the homes included in the action had Notice of Completion dates ranging from July 22, 1993 to July 29, 1997.[13] Hondo completed its work on the houses in or before July 1997.[14]

The Underlying Action also included "claims based in whole or in part upon earth movement." [15] Plaintiffs' geotechnical experts alleged that eight of the houses on which Hondo had worked showed signs of damage from soil movement.[16] It is undisputed that it rained several times, and that more than twelve inches fell, in Rancho Santa Margarita from June 1997 through March 1999.[17]

## B. Insurance Carriers

All of the parties to this suit issued commercial general liability ("CGL") policies naming Hondo as the insured.[18] USF insured Hondo from July 15, 1998 through July 15, 1999, on policy form USF–OC-CUR (Ed. 12/97, Rev.6/98) (the "USF Policy").[19] Clarendon National issued a CGL

policy to Hondo for the period from April 13 to July 15, 2000, on policy form OCC1–17 (Ed. 09/01/01, Rev.6/15/96) (the "Clarendon National Policy").[20] Clarendon America issued a CGL policy to Hondo with effective dates of July 15, 2000 through July 15, 2001, on policy form OCC1–17 (Ed. 09/01/01, Rev.6/15/96) (the "Clarendon America Policy").[21]

Prior to the issuance of USF's policy, Hondo was insured by Golden Bear Insurance Company (the "Golden Bear Policy"). The Golden Bear Policy was effective July 15, 1995 through July 15, 1996, and was written on policy form CL 100 (11–85) CG 00 01 11 85.[22] The carriers that issued policies that were effective between the expiration of the Golden Bear Policy and the inception of USF's first Policy are presently in liquidation and/or are insolvent.[23]

USF and Golden Bear defended Hondo in the Underlying Action, and funded a

---

13. Fact Stip., ¶ 11; see Defs.' Facts, ¶ 10; Pl.'s Genuine Issues, ¶ 10.

14. Fact Stip., ¶ 12; see Defs.' Facts, ¶ 11; Pl.'s Genuine Issues, ¶ 11.

15. Defs.' Facts, ¶ 17; Pl.'s Genuine Issues, ¶ 17.

16. Fact Stip., ¶ 17; see Defs.' Facts, ¶ 17; Pl.'s Genuine Issues, ¶ 17.

17. Fact Stip., ¶ 18; see Defs.' Facts, ¶ 18; Pl.'s Genuine Issues, ¶ 18.

18. Fact Stip., ¶ 3; see Defs.' Facts, ¶ 3; Pl.'s Genuine Issues, ¶ 3.

19. Fact Stip., ¶¶ 3(A), 5, Exh. 4 (USF Policy); see Defs.' Facts, ¶ 3(A); Pl.'s Genuine Issues, ¶ 3(A); Pl.'s Facts, ¶ 1.0; Defs.' Genuine Issues, ¶ 1.0.

20. Fact Stip., ¶ 3(B) (modified by Joint Notice of Errata to Stipulation of Facts in Support of Cross–Motions for Summary Judgment and/or Adjudication); see id., ¶ 5, Exh. 5 (Clarendon National Policy);see also Defs.' Facts, ¶ 3(B);

Pl.'s Genuine Issues, ¶ 3(B); Pl.'s Facts, ¶ 2.0; Defs.' Genuine Issues, ¶ 2.0. Clarendon National did not technically issue a policy to Hondo; rather, it issued a cut-through endorsement that was made part of the Hondo policy (Policy No. GLA 1253810) issued by United Capitol Insurance Company ("United Capitol"). This policy provided that Clarendon National would assume Hondo's coverage in the event United Capitol was liquidated. Because United Capitol is currently in the process of liquidation, Clarendon National is the effective liability carrier for Hondo for the period April 13 through July 15, 2000. (Fact Stip., ¶ 3(B), n. 2.)

21. Fact Stip., ¶¶ 3(C), 5, Exh. 6 (Clarendon America Policy); see Defs.' Facts, ¶ 3(C); Pl.'s Genuine Issues, ¶ 3(C); Pl.'s Facts, ¶ 3.0; Defs.' Genuine Issues, ¶ 3.0.

22. Fact Stip., ¶¶ 4, 5, Exh. 3 (Golden Bear Policy); see Defs.' Facts, ¶ 4; Pl.'s Genuine Issues, ¶ 4.

23. Fact Stip., ¶ 4; see Defs.' Facts, ¶ 4; Pl.'s Genuine Issues, ¶ 4.

settlement on its behalf.[24] Hondo's defense and indemnity were tendered to Clarendon America on February 2, 2004,[25] via a tender letter that enclosed a copy of the third amended complaint, the developers' cross-complaint, and Hondo's answer to the cross-complaint.[26] The letter also enclosed a homeowner matrix, which showed Notices of Completion on plaintiffs' homes with dates ranging from September 1993 to December 1998.[27] Clarendon National and Clarendon America declined to defend or indemnify Hondo on July 30, 2004, and confirmed their position on December 30, 2004.[28] When the parties in the Underlying Action reached a settlement, defendants refused to fund any part of the settlement on Hondo's behalf.[29]

24. Fact Stip., ¶ 13; see Defs.' Facts, ¶ 12; Pl.'s Genuine Issues, ¶ 12.

25. Pl.'s Facts, ¶ 8.0; Defs.' Genuine Issues, ¶ 8.0. USF asserts that the defense and indemnity of Hondo were tendered both to Clarendon America and Clarendon National in February 2004. The supporting declaration proffered, however, shows that the tender was made only to Clarendon America. (See Moseley Decl., ¶ 8, Exh. D (Feb. 2, 2004 Letter from Ford, Walker, Haggerty & Behar to Claim Manager, Clarendon America, re: *Alvizuri v. Fieldstone Communities* ("Tender Letter")); see *id.*, ¶ 2 (stating that Ford, Walker, Haggerty & Behar was retained by USF to defend Hondo in the Underlying Action).)

26. *Id.*, Exh. D at 69 (Tender Letter); see also *id.*, Exh. E (July 30, 2004 Letter from Kenneth A. Hearn, Hamrick & Evans, LLP to Jon T. Moseley, Esq., Ford, Walker, Haggerty & Behar re: *Eduardo Alvizuri, et al. v. Fieldstone Communities, Inc., etc., et al.* ("July 30, 2004 Response to Tender Letter").).

27. *Id.*, Exh. D at 70 (Tender Letter); Exh. E (July 30, 2004 Response to Tender Letter) (stating that an independent investigation conducted by North American Risk Services, Inc., defendants' third-party administrator, showed that Hondo furnished rough carpentry and framing services for plaintiffs' homes under contracts signed between May 1993 and the end of April or beginning of May 1997).

28. Pl.'s Facts, ¶ 8.1; Defs.' Genuine Issues, ¶ 8.1. The July 30, 2004 letter gave the following reasons for the denial of defense and indemnity: (1) because the Clarendon National and Clarendon America Policies "expressly make[ ] clear each carrier's duty to defend *any* insured contingent on the absence of any other insurance policy obligated to do so," the fact that Hondo was already being defended by other liability carriers "eliminat[ed] the conditions necessary ... to trigger any duty to defend"; (2) "to the extent any covered 'property damage' arising from Hondo's work first occurred prior to the inception of either the Clarendon Policy or UC Policy, neither Clarendon America[ ][nor] Clarendon National would have any obligation to indemnify for such damages, consistent with the express language of the policies"; and (3) "under the Absolute Earth Movement Exclusion cited above, if Plaintiffs' damages were caused in whole or in part by any 'earth movement,' as that term is defined, neither policy would have any obligation to defend or indemnify Hondo." (Moseley Decl., Exh. E at 77–78 (July 30, 2004 Response to Tender Letter).) Defendants' agent also cited the contractual liability exclusion, "damage to your work" exclusion, and "damage to impaired property" exclusion in the Policies as a basis for denying coverage. (*Id.*, Exh. E at 75–77).

Defendants confirmed their initial position on December 30, 2004. (*Id.*, Exh. F at 80 (Dec. 30, 2004 Letter from Kenneth A. Hearn, Hamrick & Evans, LLP to Jon T. Moseley, Esq., Ford, Walker, Haggerty & Behar re: *Eduardo Alvizuri, et al. v. Fieldstone Communities, Inc., etc., et al.* ("First of all, Clarendon National's and Clarendon America's previously expressed position on the duty to defend has never changed since my July 30 correspondence.... Secondly, with respect to the proposed settlement, I had earlier indicated that, to the extent covered 'property damage' arising from Hondo's work did not first occur during the Clarendon policy or the United Capitol policy, neither Clarendon America or Clarendon National would have any obligation to indemnify for such damages, consistent with the express language of the policies").)

29. Fact Stip., ¶ 13, ¶ 14; see Defs.' Facts, ¶ 13; Pl.'s Genuine Issues, ¶ 13.

USF incurred a total of $117,429.81 in attorneys' fees, costs, and expert fees defending Hondo in the Underlying Action.[30] Hondo's portion of the settlement was $225,000.00, or $2,500.00 per home for the 90 homes it framed.[31] USF funded 58.35 percent of this amount, or $131,287.50, while Golden Bear funded 41.65 percent, or $93,712.50.[32]

## C. Language Of The Policies

The USF, Clarendon National, and Clarendon America Policies have nearly identical insuring language.[33] All three provide:

### "COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. INSURING AGREEMENT

a. **We** will pay those sums that an **insured** becomes legally obligated to pay as damages for **bodily injury** or **property damage** to which this insurance applies. **We** will have the right and duty to defend any **suit** seeking those damages. However, **we** will have no duty to defend the **insured** against any suit seeking damages for **bodily injury** or **property damage** to which this insurance does not apply. **We** may, at **our** sole discretion investigate any **occurrence** and settle any claim or **suit** that may result. . . .

(4) **Our** duty to defend is excess over and shall not contribute where the insured has any other insurance under which, but for the existence of this Policy, any other insurer is obligated to provide a defense.

b. This insurance applies to **bodily injury** and **property damage** only if: . . .

(1) The **bodily injury** or **property damage** is caused by an **occurrence** which takes place in the **coverage territory**; and

(2) The **bodily injury** or **property damage** is caused by an **occurrence** which takes place during the policy period whether such **occurrence** is known to the **Insured**; and

(3) The **bodily injury** or **property damage** resulting from such **occurrence** first takes place during the policy period.

c. All **property damage** or **bodily injury** arising from, caused by or contributed to by, or in consequence of an **occurrence** shall be deemed to take place at the time of the first such damage, even though the nature and extent of such damage or injury may change and even though the damage may be continuous, progressive, cumulative, changing or evolving, and even though the **occurrence** causing such **bodily injury** or **property damage** may be continuous or repeated exposure to substantially the same general harm." [34]

---

**30.** Pl.'s Facts, ¶¶ 6.0–6.3 (stating that USF paid defense fees of $34,246.50, costs of $7,214.62, and $75,968.69 in expert fees, for a total of $117,429.81); Defs.' Genuine Issues, ¶¶ 6.0–6.3 ("[A]ccording to Defendants' information, USF incurred a total of $117,429.81 in defense fees and costs on behalf of Hondo in connection with the Underlying Action"); see also Defs.' Facts, ¶ 16(A); Pl.'s Genuine Issues, ¶ 16(A).

**31.** Fact Stip., ¶ 15; see Defs.' Facts, ¶ 14; Pl.'s Genuine Issues, ¶ 14.

**32.** Fact Stip., ¶ 15; see Defs.' Facts, ¶ 14; Pl.'s Genuine Issues, ¶ 14; Pl.'s Facts, ¶ 7.0; Defs.' Genuine Issues, ¶ 7.0.

**33.** Pl.'s Facts, ¶ 4.0; Defs.' Genuine Issues, ¶ 4.0.

**34.** Fact Stip., ¶ 6, Exh. 4 at 3 (USF Policy), Exh. 5 at 3 (Clarendon National Policy), Exh. 6 at 3 (Clarendon America Policy); see Defs.' Facts, ¶¶ 5, 7; Pl.'s Genuine Issues, ¶¶ 5, 7; Pl.'s Facts, ¶¶ 11.1, 11.2; Defs.' Genuine Issues, ¶¶ 11.1, 11.2.

The USF, Clarendon National, and Clarendon America Policies define the terms "property damage" and "occurrence" identically. "Property damage" is "[p]hysical injury to tangible property including all resulting loss of use of that property'" "[a]ll ... loss of use shall be deemed to occur at the time of the physical injury that caused it." [35] An "occurrence" is "[a]n accident, including continuous or repeated exposure to substantially the same general harm." [36]

All three Policies also contain an identical Absolute Earth Movement Exclusion, which excludes from coverage:

"**Bodily injury or property damage** claimed, in whole or in part, to arise from or be aggravated by, or claimed to result from or be the consequence of earth movement, whether the earth movement is combined with any other cause. Earth movement includes, but is not limited to earthquake, landslide, subsidence, mudflow, sinkhole, erosion, or the sinking, rising, shifting, expanding or contracting of earth or soil.

This exclusion applies regardless of the cause or causes of the earth movement and includes defects or negligence in design, construction or materials, or any other event, conduct or misconduct which may have or is claimed to have precipitated, caused or acted jointly, concurrently, or in sequence with earth movement in causing the **bodily injury** or **property damage.**

Notwithstanding any provision of this policy to the contrary, where any claim or suit is based in whole or in part upon earth movement, as set forth above, the Company shall have the right, but not the obligation, to defend such lawsuit. The Company shall reimburse the insured upon the conclusion or resolution of the claim or suit, based upon the proportion of damages covered by the policy to damages excluded herein.

This exclusion only applies to **bodily injury** and **property damage** that is included in the **Products–Completed Operation Hazard.**" [37]

## D. USF's Claims

USF does not dispute that its Policy and Golden Bear's Policy covered the claims asserted against Hondo.[38] It contends, however, that Clarendon National and Clarendon America also had a duty to defend Hondo in the Underlying Action, and that they should have participated in the defense on an "equal share" basis.[39] USF requests that the court order each defendant to reimburse USF a third of the total defense fees and costs it paid, or $39,143.27 each.[40]

USF also contends that defendants should be ordered to contribute a share of the settlement paid on Hondo's behalf. USF asserts that Clarendon National and Clarendon America should have indemnified Hondo on a "time-on-risk" basis, as measured by the dates of the Notices of Completion for the allegedly defective

---

35. Fact Stip., ¶ 7(A); see Defs.' Facts, ¶ 6(A); Pl.'s Genuine Issues, ¶ 6(A).

36. Fact Stip., ¶ 7(B); see Defs.' Facts, ¶ 6(B); Pl.'s Genuine Issues, ¶ 6(B).

37. Fact Stip., ¶ 9; see Defs.' Facts, ¶ 8; Pl.'s Genuine Issues, ¶ 8; Pl.'s Facts, ¶ 11.3; Defs.' Genuine Issues, ¶ 11.3.

38. Defs.' Facts, ¶ 16; Pl.'s Genuine Issues, ¶ 16.

39. Fact Stip., ¶¶ 16, 16(A); see Defs.' Facts, ¶ 16(A); Pl.'s Genuine Issues, ¶ 16(A).

40. Fact Stip., ¶ 16(A); see Defs.' Facts, ¶ 16(A); Pl.'s Genuine Issues, ¶ 16(A).

homes.[41] USF contends that Clarendon National should be ordered to pay $14,587.50 as its share of the indemnification obligation, while Clarendon America should be ordered to pay $58,250.00.[42]

## II. DISCUSSION

### A. Legal Standard Governing Motions For Summary Judgment

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); FED.R.CIV.PROC. 56(e).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The evidence presented by the parties must be admissible. FED.R.CIV.PROC. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Nelson v. Pima Community College*, 83 F.3d 1075, 1081–82 (9th Cir.1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment"); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979).

In this case, the parties have filed cross-motions for summary judgment or partial summary judgment "[T]he mere fact that the parties make cross-motions for summary judgment does not necessarily mean that there are no disputed issues of material fact and does not necessarily permit the judge to render judgment in favor of one side or the other." *Starsky v. Williams*, 512 F.2d 109, 112 (9th Cir.1975) (citation omitted). Summary judgment in favor of one party may be appropriate, however, where, as here, "the parties in fact agree[ ] that all of the underlying material facts [are] those reflected by the written record before the court," and the only remaining dispute is a legal one. *Id.*

In their motion, Clarendon National and Clarendon America assert that their Policies (collectively, the "Clarendon Policies") did not cover the claims asserted against Hondo in the Underlying Action because: "(1) The alleged 'property damage' [did]

---

41. *Id.*, ¶ 16(B); see Defs.' Facts, ¶ 16(B); Pl.'s Genuine Issues, ¶ 16(B).

42. Fact Stip., ¶ 16(B); see Defs.' Facts, ¶ 16(B); Pl.'s Genuine Issues, ¶ 16(B).

not arise from an 'occurrence' that took place during either of the Clarendon policy periods as required by the Insuring Agreements...; *AND* (2) The alleged 'property damage' did not 'first take place' during either of the Clarendon policy periods as required by the Insuring Agreements...."[43] Consequently, defendants contend, they had no duty to indemnify Hondo in the Underlying Action, and have no obligation to reimburse USF for any part of the settlement payment it made on Hondo's behalf.[44] Defendants also contend that they had no duty to defend Hondo in the Underlying Action because of two exclusionary provisions in their Policies, namely, the "absolute earth movement exclusion" and the "excess defense" clause.[45] Thus, they assert they are entitled to summary judgment or partial summary judgment on USF's first and third causes of action.

USF counters that summary judgment or partial summary judgment should be entered in its favor because the undisputed facts show that both the "occurrence" and "property damage" took place during the Clarendon policy periods.[46] USF contends that defendants' reliance on the "excess insurance" and "absolute earth movement exclusion" provisions is contrary to California law, and asserts that nothing in the

Policies absolved defendants of their clear duty to defend Hondo in the Underlying Action.[47] It requests that the court order defendants to pay an equitable share of the defense fees and settlement payment.

**B. Whether Defendants Had A Duty To Indemnify Hondo In The Underlying Action And Whether Plaintiff Is Entitled To Equitable Contribution**

To decide whether defendants had a duty to indemnify Hondo, the court must first interpret the coverage provisions and exclusions in the Clarendon Policies. See *Modern Dev. Co. v. Navigators Ins. Co.*, 111 Cal.App.4th 932, 939, 4 Cal.Rptr.3d 528 (2003) ("... [I]n determining whether allegations in a particular complaint give rise to coverage under a comprehensive general liability policy, courts must consider both the occurrence language in the policy, and the endorsements or exclusions affecting coverage, if any, included in the policy terms," citing *Collin v. Am. Empire Ins. Co.*, 21 Cal.App.4th 787, 803, 26 Cal. Rptr.2d 391 (1994)).

**1. Standard Governing Interpretation Of An Insurance Policy**

Under California law,[48] interpretation of an insurance policy is a legal

---

43. Memorandum of Points and Authorities in Support of Defendants Clarendon America and Clarendon National's Motion for Summary Judgment, or, in the Alternative, for Summary Adjudication of the Plaintiff's First and Third Causes of Action ("Defs.' Mot.") at 3; see *id.* at 10–20. Defendants oppose plaintiff's motion on the same grounds. (See Memorandum of Points and Authorities in Opposition to USF's Motion for Summary Judgment, or in the Alternative Summary Adjudication ("Defs.' Opp.") at 3.)

44. Defs.' Mot. at 20; Defs.' Opp. at 10–12.

45. Defs.' Mot. at 20–28; Defs.' Opp. at 12.

46. Memorandum of Points and Authorities in Support of USF Insurance Company's Motion for Summary Judgment, or in the Alternative Summary Adjudication ("Pl.'s Mot.") at 12–14. Plaintiff opposes defendants' motion on the same grounds. (See Memorandum of Points and Authorities in Support of USF Insurance Company's Opposition to Clarendon's Motion for Summary Judgment, or in the Alternative Summary Adjudication to Plaintiff's First and Third Causes of Action ("Pl.'s Opp.") at 1–13.)

47. Pl.'s Mot. at 15–21.

48. USF argues that California law governs this case. (Pl.'s Mot. at 11.) Clarendon

matter for the court. See *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 18, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995); see also *Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.*, 45 Cal. App.4th 1, 10–11, 52 Cal.Rptr.2d 690 (1996) ("Interpretation of an insurance policy is primarily a judicial function"). The principles governing the interpretation of insurance policies are well-settled. Because insurance policies are contracts, ordinary rules of contractual interpretation apply. See *La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.*, 9 Cal.4th 27, 37, 36 Cal.Rptr.2d 100, 884 P.2d 1048 (1994); *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1264, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992).

"The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." *Bank of the West*, 2 Cal.4th at 1264, 10 Cal.Rptr.2d 538, 833 P.2d 545 (citing CAL. CIVIL CODE § 1636); see also *La Jolla Beach & Tennis Club*, 9 Cal.4th at 37, 36 Cal.Rptr.2d 100, 884 P.2d 1048. To ascertain the parties' intent, the court must look first to the language of the policy itself. See *A.B.S. Clothing Collection, Inc. v. Home Ins. Co.*, 34 Cal.App.4th 1470, 1478, 41 Cal.Rptr.2d 166 (1995); *La Jolla Beach & Tennis Club*, 9 Cal.4th at 37, 36 Cal.Rptr.2d 100, 884 P.2d 1048. If, given their "common and popular meaning," the contract terms are clear and explicit, they control. See *Bank of the West*, 2 Cal.4th at 1264, 10 Cal. Rptr.2d 538, 833 P.2d 545 (citing Cal. Civil Code § 1638); *A.B.S.*, 34 Cal.App.4th at 1478, 41 Cal.Rptr.2d 166; see also *Republic Indemnity Co. of America v. Schofield*,

47 Cal.App.4th 220, 225, 54 Cal.Rptr.2d 637 (1996) (provisions are to be "interpreted in their 'ordinary and popular sense'").

■ A policy provision is "ambiguous when it is capable of two or more constructions, both of which are reasonable." *La Jolla Beach & Tennis Club*, 9 Cal.4th at 37, 36 Cal.Rptr.2d 100, 884 P.2d 1048 (quotations omitted). " 'Courts will not adopt a strained or absurd interpretation [of policy language, however,] in order to create an ambiguity where none exists.' " *Id.* (quoting *Reserve Ins. Co. v. Pisciotta*, 30 Cal.3d 800, 807, 180 Cal.Rptr. 628, 640 P.2d 764 (1982)). Where ambiguity is found, policy terms must be construed to give effect to the objectively reasonable expectations of the insured. *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.*, 5 Cal.4th 854, 867, 21 Cal.Rptr.2d 691, 855 P.2d 1263 (1993); *A.B.S.*, 34 Cal.App.4th at 1478, 41 Cal.Rptr.2d 166. If application of these rules does not eliminate or resolve an ambiguity in the policy, it is resolved against the insurer and in favor of liability under the policy. *La Jolla Beach & Tennis Club*, 9 Cal.4th at 37, 36 Cal.Rptr.2d 100, 884 P.2d 1048; *Bank of the West*, 2 Cal.4th at 1265, 10 Cal.Rptr.2d 538, 833 P.2d 545.

### 2. Coverage Terms In The Clarendon Policies

The Clarendon Policies require that the insurer "pay those sums that an insured becomes legally obligated to pay as damages for bodily injury or property damage to which this insurance applies." [49] The Policies condition coverage on two key re-

---

National and Clarendon America do not challenge this assertion, and, like USF, cite California law in support of their motion. Because the parties are in agreement, and because the subject matter of the insurance contract was located in California, the court will apply California law. See *Stonewall Surplus Lines Ins. Co. v. Johnson Controls, Inc.*, 14 Cal.App.4th 637, 646, 17 Cal. Rptr.2d 713 (1993) (California choice of law rules place particular importance on the location of the insured risk).

**49.** Fact Stip., ¶ 6.

quirements: (1) "The bodily injury or property damage [must be] caused by an occurrence which takes place during the policy period whether such occurrence is known to the Insured"; and (2) "The bodily injury or property damage resulting from such occurrence [must] first take[ ] place during the policy period."[50] The Policies also contain a "deemer clause," which provides: "All property damage or bodily injury arising from, caused by or contributed to by, or in consequence of an occurrence shall be deemed to take place at the time of the first such damage, even though the nature and extent of such damage or injury may change and even though the damage may be continuous, progressive, cumulative, changing or evolving, and even though the occurrence causing such bodily injury or property damage may be continuous or repeated exposure to substantially the same general harm."[51]

The Policies provide a standard definition of "property damage," i.e., "[p]hysical injury to tangible property including all resulting loss of use of that property."[52] "Occurrence" is defined as "[a]n accident, including continuous or repeated exposure to substantially the same general harm."[53]

Defendants argue it is clear under these coverage provisions that "occurrence" is not synonymous with "property damage," and that it refers to the *cause* of the property damage.[54] They assert that the operative "occurrence" in this case was either Hondo's purportedly negligent work on 90 of the 127 homes at issue in the Underlying Action, or the exposure of its work to the elements.[55] Defendants contend that because Hondo completed its framing work in or before July 1997, and because more than twelve inches of rain fell in Rancho Santa Margarita between June 1997 and March 1999,[56] the "occurrence" could not have transpired during their policy periods.[57] They also assert that the property damage caused by Hondo's defective work first occurred before the inception of the Policies. In support, they cite the report of their agent, Dynamic Claims Services, Inc., which contains a summary of homeowner complaints between 1994 and 1998, regarding cracks and splits in the walls and stucco, water leakage, and other damages that appear to have resulted from defects in the framing and rough carpentry of the houses.[58] Be-

---

**50.** *Id.* The third requirement for coverage is that "The bodily injury or property damage is caused by an occurrence which takes place in the coverage territory." *Id.* Because the parties do not dispute that the property damage took place within the coverage territory, the court does not analyze this issue.

**51.** *Id.*

**52.** *Id.*, ¶ 7(A).

**53.** *Id.*, ¶ 7(B).

**54.** Defs.' Mot. at 10–11.

**55.** *Id.* at 13–14.

**56.** Fact Stip., ¶ 18. See Defs.' Facts, ¶ 18; Pl.'s Genuine Issues, ¶ 18.

**57.** See Defs.' Mot. at 20.

**58.** See Declaration of James F. Berry in Support of Defendants' Motion for Summary Judgment or, in the Alternative, for Summary Adjudication ("Berry Decl."), Exh. 1. Plaintiff objects to the Dynamic Claims Services report on multiple grounds: (1) that it is inadmissible hearsay under Rules 801(c) and 802 of the Federal Rule of Evidence; (2) that it is irrelevant under Rules 401 and 402; (3) that it is unfairly prejudicial and will confuse the issues under Rule 403; (4) that the author of the report lacks personal knowledge of the facts recited therein, making it inadmissible under Rule 602; (5) that the report has not been authenticated as required by Rule 901; and (6) that it is improper opinion testimony under Rule 701. (Pl.'s Genuine Issues, ¶ 19.) Because the court finds it unnecessary to refer to the report in deciding the coverage issue, it declines to rule on USF's objections at this time.

cause they assert that neither the accident constituting the "occurrence" nor the first instance of "property damage" caused by the occurrence took place within their policy periods, defendants contend the Policies did not provide coverage to Hondo for the Underlying Action.[59]

USF counters that because the homeowners filed their action on June 20, 2003 and alleged that they had only discovered the defects within the prior three years, "all of the damages plaintiffs were seeking became manifest at the earliest during the Clarendon policies."[60] While acknowledging that the "manifestation" of property damage is not synonymous with an "occurrence," USF asserts that "in the absence of other evidence [manifestation] is the only evidence of the 'occurrence of damage.'"[61] USF also contends that the "continuous injury trigger" rule, adopted by the California Supreme Court in *Montrose Chemical Corp. v. Admiral Ins. Co.*, 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878 (1995) (*"Montrose II"*), controls here. Under that rule, USF argues, the Clarendon Policies afforded coverage to Hondo because the homeowners continued to experience property damage between April 2000 and July 2001.[62]

In *Montrose II*, a chemical company that had produced the pesticide dichloro-diphenyl-trichlorethane (DDT) from 1947 to 1982 was sued in five separate actions alleging improper disposal of hazardous wastes. *Id.* at 656, 42 Cal.Rptr.2d 324, 913 P.2d 878. From January 1960 to March 1986, the chemical company was insured by seven different carriers; each policy covered a distinct time period within the twenty-six year span. *Id.* Admiral Insurance Company had issued four CGL policies with effective dates from October 1982 to March 1986. *Id.* The question on appeal was whether Admiral had a duty to defend the chemical company in the third-party suits—that is, whether there was a possibility that events took place during Admiral's policy periods that triggered coverage under its policies. *Id.;* see also *id.* at 655 n. 2, 42 Cal.Rptr.2d 324, 913 P.2d 878 (". . . '[T]rigger of coverage' is a term of convenience used to describe that which, under the specific terms of an insurance policy, must happen in the policy period in order for the *potential* for coverage to arise. The issue is largely one of timing— what must take place *within the policy's effective dates* for the potential of coverage to be 'triggered'?" (emphasis original)).

To answer this question, the California Supreme Court carefully examined the coverage provisions of Admiral's policies, which used the standard language of CGL policies at the time. *Id.* at 656, 42 Cal. Rptr.2d 324, 913 P.2d 878. Admiral's policies provided that the insurer would "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . bodily injury, or . . . property damage to which this insurance applies, caused by an occurrence." *Id.* The policies defined "property damage" as "(1) physical injury to or destruction of tangible property *which occurs during the policy period,* including the loss of use thereof at any time resulting therefrom . . . ." *Id.* at 668, 42 Cal.Rptr.2d 324, 913 P.2d 878 (emphasis original). They defined "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the in-

---

**59.** Defs.' Mot. at 11–20.

**60.** *Id.* at 12.

**61.** *Id.*

**62.** Pl.'s Mot. at 1.

sured." *Id.* at 656, 42 Cal.Rptr.2d 324, 913 P.2d 878.

The Court concluded that these provisions were plain and unambiguous. It observed first that "property damage" definition "clearly and explicitly provide[d] that the occurrence of bodily injury or property damage during the policy period [was] the operative event that trigger[ed] coverage." *Id.* at 669, 42 Cal.Rptr.2d 324, 913 P.2d 878. Reading all of the clauses together, the Court determined that the policies distinguished between the causative "occurrence" and the resulting "property damage," and unambiguously provided that it was the "the latter injury or damage that must 'occur' during the policy period" before coverage would be triggered. *Id.* Because plaintiffs in the pending actions had alleged that their bodily injury and property damage "continuously or progressively deteriorat[ed] throughout Admiral's policy periods," the Court held that there was a potential for coverage under Admiral's policies. *Id.;* see also *id.* at 673, 42 Cal. Rptr.2d 324, 913 P.2d 878 ("[T]he weight of authority, consistent with our own interpretation of Admiral's express policy language, is that bodily injury and property damage that is continuous or progressively deteriorating throughout successive CGL policy periods, is potentially covered by all policies in effect during those periods").

 The Clarendon Policies contain contractual language that is different than that of the policies at issue in *Montrose II*. In fact, as USF concedes, the coverage terms of defendants' Policies were revised in 1996 to "circumvent the continuous injury trigger of the coverage rule laid down" in *Montrose II*.[63] Insurance companies are not required to use the standard policy form; they are free to modify the standard language or adopt their own non-standard

policy. See *Dart Indus., Inc. v. Commercial Union Ins. Co.,* 28 Cal.4th 1059, 1074 & n. 5, 124 Cal.Rptr.2d 142, 52 P.3d 79 (2002); cf. *La Jolla Beach & Tennis Club,* 9 Cal.4th at 37, 36 Cal.Rptr.2d 100, 884 P.2d 1048 ("While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply" (citations omitted)). Thus, to determine whether Clarendon National and Clarendon America had a duty to defend Hondo in the Underlying Action, the court must look to the particular language of their Policies. *Garriott Crop Dusting Co. v. Superior Court,* 221 Cal.App.3d 783, 790, 270 Cal. Rptr. 678 (1990) ("The proper initial focus for a court in resolving a question of insurance coverage is on the language of the insurance policy itself, rather than on judicially created 'general' rules that are not necessarily responsive to the policy language or facts of the dispute," citing *Harbor Ins. Co. v. Central National Ins. Co.,* 165 Cal.App.3d 1029, 1034–35, 211 Cal. Rptr. 902 (1985)).

 Like the policies at issue in *Montrose II,* the Clarendon Policies make a clear distinction between the "occurrence," which is the accident or exposure that *causes* damage to the claimant, and the resulting "physical damage." See *Montrose II,* 10 Cal.4th at 669, 42 Cal.Rptr.2d 324, 913 P.2d 878. Where the Clarendon Policies depart from the *Montrose II* policies is in the requirements for coverage. The standard policy language in 1995 provided coverage so long as *some* bodily injury or property damage took place within the policy period, regardless of when the injury or damage began. See *id.* at 676, 42 Cal.Rptr.2d 324, 913 P.2d 878 ("The timing of the accident, event, or conditions *causing* the bodily injury or

---

63. Pl.'s Opp. at 10.

property damage, e.g., an insured's negligent act, is largely immaterial to establishing coverage; it can occur before or during the policy period. Neither is the date of discovery of the damage or injury controlling. . . . It is only the *effect*—the occurrence of bodily injury or property damage during the policy period, resulting from a sudden accidental event or the 'continuous or repeated exposure to conditions'—that triggers potential liability coverage"). The Clarendon Policies, by contrast, require that both the *occurrence* and the *first* instance of property damage take place during the policy period.[64] Additionally, they explicitly deem that all property damage caused contributed to by an occurrence takes place "at the time of the first such damage." This is so "even though the nature and extent of such damage or injury may change and even though the damage may be continuous, progressive, cumulative, changing or evolving, and even though the occurrence causing such bodily injury or property damage may be continuous or repeated exposure to substantially the same general harm." [65] These provisions make clear that progressive property damage that starts before the insurers' policy period, but continues into the period, does not trigger coverage. Rather, the Policies explicitly place property damage of this type *outside the scope of the insuring agreement*. As a result, the unequivocal language of the Clarendon Policies is not susceptible of the interpretation given the older policy language in *Montrose II*. See David L. Leitner, Reagan W. Simpson, and John M. Bjorkman, 4 LAW AND PRAC. OF INS. COVERAGE LITIG., § 46:21 (2005) ("In response to *Montrose* and those courts that have adopted it, the ISO recently revised the standard CGL policy to ex-

clude from coverage injury or damage that occurs 'in part' before the policy begins. This change will obviously reduce the number of insurers deemed responsible to defend and indemnify an insured under the continuous trigger theory," citing Insurance Risk Management Institute, EXECUTIVE BRIEFING IN COMMERCIAL LIABILITY INSURANCE, Vol I (July 1999)); see also *La Jolla Beach & Tennis Club*, 9 Cal.4th at 37, 36 Cal.Rptr.2d 100, 884 P.2d 1048 ("If contractual language is clear and explicit, it governs" (citations omitted)); *St. Paul Fire & Marine Ins. Co. v. Coss*, 80 Cal. App.3d 888, 896, 145 Cal.Rptr. 836 (1978) ("An insurance policy is a contract, and when the terms are plain and unambiguous, it is the duty of the court to hold the parties to such contract. The courts will not indulge in a forced construction of an insurance policy so as to fasten a liability on the insurance company which it has not assumed" (citation omitted)).

USF concedes that there is coverage under its Policy, which contains the same insuring language as the Clarendon Policies.[66] It is therefore undisputed that at least some "property damage" to the Rancho Santa Margarita homes took place during USF's policy period, i.e., between July 15, 1998 and July 15, 1999.[67] Consequently, the *first* instance of "property damage" could not have taken place during subsequent policy periods when defendants were on the risk. Having admitted coverage under its own Policy, USF's contention that coverage under defendants' Policies was also triggered essentially asks the court to ignore or rewrite Section I.A.b(3), which plainly requires that "[t]he bodily injury or property damage resulting

---

64. See Fact Stip., ¶ 6.

65. *Id.*

66. Defs.' Facts, ¶ 16; Pl.'s Genuine Issues, ¶ 16.

67. Fact Stip., ¶ 3(A), ¶ 5, Exh. 4 (USF Policy).

from such occurrence first take[ ] place during the policy period."[68] This the court declines to do. See *Safeco Ins. Co. v. Gilstrap*, 141 Cal.App.3d 524, 532–33, 190 Cal.Rptr. 425 (1983) ("Although we construe all provisions, conditions, or exceptions that tend to limit liability strictly against the insurer, strict construction does not mean strained construction. We may not, under the guise of strict construction, rewrite a policy to bind the insurer to a risk that it did not contemplate and for which it has not been paid" (citations omitted)).

■ Because the homeowners' property damage did not first take place during the Clarendon policy periods, the court concludes that defendants had no duty to indemnify Hondo in the Underlying Action. USF, moreover, has identified no compelling equitable reason to impose liability on defendants where none exists under their Policies. See *Truck Ins. Exchange v. Unigard Ins. Co.*, 79 Cal.App.4th 966, 974, 94 Cal.Rptr.2d 516 (2000) ("In the insurance context, the right to contribution arises when several insurers are *obligated to indemnify or defend the same loss or claim*, and one insurer has paid more than its share of the loss or defended the action without any participation by the others.... Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was equally and concurrently owed by the other insurers .... *[A]bsent compelling equitable reasons*, courts should not impose an obligation on an insurer that contravenes a provision in its insurance policy" (citations omitted and emphasis added)); see also *Signal Companies, Inc. v. Harbor Ins. Co.*, 27 Cal.3d 359, 369, 165 Cal.Rptr. 799, 612 P.2d 889 (1980) ("To impose an obligation on Harbor to reimburse Pacific in contravention of the provisions of its policy could only be justified, however, by some compelling equitable consideration. We find no such consideration here. Before seeking Harbor's contribution to the settlement, Pacific acted in all respects for its own benefit. The defense costs at issue were incurred by Pacific in the performance of its contractual obligation to its insured to afford a defense"). The court therefore concludes that Clarendon National and Clarendon America have neither a legal duty nor an equitable obligation to

68. To prevail on summary judgment, defendants need only point to an absence of evidence to support USF's cause of action. The only evidence in the record concerning the cause of the property damage suffered by the Rancho Santa Margarita homeowners is the parties' factual stipulations regarding Hondo's negligent framing work, which was completed in or before July 1997, and the amount of rainfall that feel in Rancho Santa Margarita between June 1997 and March 1999. USF has adduced no evidence tending to show that the occurrence that caused property damage during defendants' policy periods was different than that which caused property damage during its own policy period. As a result, under the deemer clause, all property damage that took place during defendants' policy periods must be treated as having first taken place during plaintiff's policy period or earlier. When the damage or defects first "manifested" is irrelevant. See *Montrose II*, 10 Cal.4th at 676, 42 Cal.Rptr.2d 324, 913 P.2d 878 (in determining whether property damage took place within the policy period, "the date of discovery of the damage or injury [is not] controlling"); *Pepperell*, 62 Cal.App.4th at 1055, 73 Cal.Rptr.2d 164 (holding, in a case where the third-party claimant "alleged defective design and construction involving virtually every part of the home" and latent defects "were not discovered until [several years after the completion of the construction]..., when [they] began to manifest themselves to varying degrees," that the injury was potentially a "continuing and progressively deteriorating process which *began with defective design and construction* admittedly *within* the pertinent policy period" (emphasis added)).

contribute to the settlement amount. Accordingly, the court grants defendants' motion for summary judgment on plaintiffs' second and fourth causes of action, and denies USF's cross-motion as to these claims.

### C. Whether Defendants Had A Duty To Defend Hondo In The Underlying Action

#### 1. Legal Standard Governing An Insurer's Duty To Defend

 Under California law, an insurer has a broad duty to defend its insured, which "may apply even in an action where no damages are ultimately awarded." *Scottsdale Ins. Co. v. MV Transp.,* 36 Cal.4th 643, 654, 31 Cal.Rptr.3d 147, 115 P.3d 460 (2005) (citing *Horace Mann Ins. Co. v. Barbara B.,* 4 Cal.4th 1076, 1081, 17 Cal.Rptr.2d 210, 846 P.2d 792 (1993)). In *Montrose Chemical Corp. v. Superior Court,* 6 Cal.4th 287, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (1993) (*"Montrose I"*), and again in *Montrose II,* 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878, the California Supreme Court held that when a suit against an insured alleges a claim that "potentially" or even "possibly" may subject the insured to liability for covered damages, an insurer must defend unless and until it can demonstrate, by reference to "undisputed facts," that the claim is not covered. *Montrose I,* 6 Cal.4th at 299-300, 24 Cal.Rptr.2d 467, 861 P.2d 1153; see also *Montrose II,* 10 Cal.4th at 661-62 n. 10, 42 Cal.Rptr.2d 324, 913 P.2d 878; *Pardee Construction Co. v. Insurance Co. of the West,* 77 Cal.App.4th 1340, 1351, 92 Cal.Rptr.2d 443 (2000).

 California courts consider all facts available to the insurer at the time the insured tenders a claim in determining the scope of the insurer's defense obligation. *Montrose I,* 6 Cal.4th at 287, 24 Cal. Rptr.2d 467, 861 P.2d 1153 (stating that the court must examine "the policy, the complaint, and all facts known to the insurer from any source"); *Barnett v. Fireman's Fund Ins. Co.,* 90 Cal.App.4th 500, 508-09, 108 Cal.Rptr.2d 657 (2001) ("The existence of the duty to defend turns on all facts known by the insurer at the inception of the third party lawsuit"); *CNA Casualty of Cal. v. Seaboard Surety Co.,* 176 Cal.App.3d 598, 605, 222 Cal.Rptr. 276 (1986) ("An insurer's duty to defend must be analyzed and determined on the basis of any potential liability arising from facts available to the insurer from the complaint or other sources available to it at the time of the tender of defense"); see also *Systems XIX, Inc. v. United Capitol Ins. Co.,* No. C 98–0481 MJJ, 1999 WL 447599, * 5 (N.D.Cal. June 23, 1999) (Unpub.Disp.) (the duty-to-defend inquiry "focuses on what the insurer knew or should have known at the time of declining coverage").

To determine whether an insurer has a duty to defend, the court first compares the allegations of the complaint with the terms of the policy, and ascertains whether the facts alleged, together with facts not alleged but known to the insurer at the inception of the lawsuit or tender of defense, reveal a possibility that the claim is covered. *Montrose I,* 6 Cal.4th at 295, 24 Cal.Rptr.2d 467, 861 P.2d 1153; see also *State Farm Fire & Casualty Co. v. Century Indemnity Co.,* 59 Cal.App.4th 648, 657, 69 Cal.Rptr.2d 403 (1997). Facts outside the allegations of the complaint are considered because of the possibility that the pleadings could be amended to state a covered claim. See *Scottsdale Ins. Co. v. MV Transp.,* 36 Cal.4th 643, 654, 31 Cal. Rptr.3d 147, 115 P.3d 460 (2005) ("But the duty also exists where extrinsic facts known to the insurer suggest that the claim may be covered"); *Montrose I,* 6 Cal.4th at 296, 24 Cal.Rptr.2d 467, 861 P.2d 1153 ("[F]acts known to the insurer

and extrinsic to the third party complaint can generate a duty to defend, even though the face of the complaint does not reflect a potential for liability under the policy. This is so because current pleading rules liberally allow amendment; the third party plaintiff cannot be the arbiter of coverage" (citations omitted)); *State Farm Fire & Casualty Co.*, 59 Cal.App.4th at 657, 69 Cal.Rptr.2d 403 ("In determining whether an insurer has a duty to defend, a court first compares the allegations in the complaint with terms of the policy. Next, it looks to facts that may not have been alleged but were known to the insurer when the action was filed").

■■■ "[T]he insured is entitled to a defense if the underlying complaint alleges the insured's liability for damages potentially covered under the policy, or if the complaint might be amended to give rise to a liability that would be covered under the policy." *Montrose I*, 6 Cal.4th at 299, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (citing *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 275–76, 54 Cal.Rptr. 104, 419 P.2d 168 (1966)); see also *Pepperell v. Scottsdale Ins. Co.*, 62 Cal.App.4th 1045, 73 Cal. Rptr.2d 164 (1998). "Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor." *Horace Mann Ins. Co.*, 4 Cal.4th at 1081, 17 Cal.Rptr.2d 210, 846 P.2d 792; see also *Modern Dev. Co. v. Navigators Ins. Co.*, 111 Cal.App.4th 932, 942, 4 Cal.Rptr.3d 528 (2003).

■■■ The duty to defend is not without limits, however. " '[T]he insurer need not defend if the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage.' " *La Jolla Beach & Tennis Club*, 9 Cal.4th at 39, 36 Cal.Rptr.2d 100, 884 P.2d 1048 (quoting *Gray*, 65 Cal.2d at 276 n. 15, 54 Cal.Rptr. 104, 419 P.2d 168); see also *Uhrich v. State Farm Fire & Cas.*

*Co.*, 109 Cal.App.4th 598, 135 Cal.Rptr.2d 131, (2003) (" . . . [T]he obligation to defend is not without limits . . . . [T]he duty to defend derives from the insurer's coverage obligations assumed under the insurance contract. Thus, where there is no potential for coverage, there is no duty to defend," quoting *Quan v. Truck Ins. Exchange*, 67 Cal.App.4th 583, 591–92, 79 Cal. Rptr.2d 134 (1998) (internal quotations and citations omitted)). Stated differently, "[w]here there is no potential for the third party to recover on a covered claim, there is no duty to defend." *Devin v. United Services Auto. Assn.*, 6 Cal.App.4th 1149, 1157, 8 Cal.Rptr.2d 263 (1992) (citations omitted). The insured " 'may not speculate about unpled third party claims to manufacture coverage.' " *Michaelian v. State Comp. Ins. Fund*, 50 Cal.App.4th 1093, 1106, 58 Cal.Rptr.2d 133 (1996) (quoting *Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co.*, 14 Cal.App.4th 1595, 1605, 18 Cal.Rptr.2d 692 (1993)). Moreover, the insurer has no duty to defend where the potential for liability is " 'tenuous and farfetched.' " *Id.* (quoting *American Guar. & Liability v. Vista Medical Supply*, 699 F.Supp. 787, 794 (N.D.Cal. 1988)). The ultimate question is whether the facts alleged "fairly apprise" the insurer that suit is being brought on a covered claim. *Id.* (quoting *Gray*, 65 Cal.2d at 275 n. 15, 54 Cal.Rptr. 104, 419 P.2d 168).

■■■ An insurer has a duty to defend where there is a *factual* possibility of coverage. The mere fact that the courts have not previously construed the policy provision on which the insurer relies to deny a defense does not give rise to a duty on its part. *Waller*, 11 Cal.4th at 25, 44 Cal.Rptr.2d 370, 900 P.2d 619 ("Plaintiffs' related claim, that the lack of authority on the duty to defend issue required a defense by T.I.E. of the Amey lawsuit because 'uncertainty of policy interpretation

compels a duty to defend in this case,' is equally unmeritorious. *CNA Casualty* does not hold, as plaintiffs suggest, that the insurer must always defend a third party lawsuit absent a published judicial opinion definitively construing the specific policy provision on which the insurer relies, or, as plaintiffs assert, 'until the extent of "the policy coverage" is legally certain,' to deny the defense. This has never been the law," citing *McLaughlin v. Nat'l Union Fire Ins. Co.*, 23 Cal.App.4th 1132, 1151, 29 Cal.Rptr.2d 559 (1994)). "[T]he law governing the insurer's duty to defend need not be settled at the time the insurer makes its decision. As several courts have explained, subsequent case law can establish, in hindsight, that no duty to defend ever existed." *Scottsdale Ins. Co.*, 36 Cal.4th at 657, 31 Cal.Rptr.3d 147, 115

P.3d 460 (citations omitted); see *Waller*, 11 Cal.4th at 26, 44 Cal.Rptr.2d 370, 900 P.2d 619 ("If the terms of the policy provide no potential for coverage, ... the insurer acts properly in denying a defense even if that duty is later evaluated under case law that did not exist at the time of the defense tender" (citations omitted)).

Clarendon National and Clarendon America "do not dispute that at the time of tender, ... the Underlying Action did, in fact, present the possibility of damage within the coverage grant." They concede that they "*would* have had an obligation to defend Hondo, or more accurately to participate in the defense along with Golden Bear and USF," but for the "absolute earth movement exclusion" and "excess defense" provisions in the Policies.[69] The

**69.** Defs.' Opp. at 11–12. In other parts of their opposition to plaintiff's motion, defendants argue that "if there is no coverage then there is no defense or indemnity obligation," i.e., that a finding that there was no coverage under the Clarendon Policies automatically absolves them of any duty to defend Hondo in the Underlying Action. (Defs.' Opp. at 3.) *Montrose I* makes clear that a duty to defend arises if there is any *potential* for coverage, measured at the time the third-party suit is commenced or the defense tender is made. See *Montrose I*, 6 Cal.4th at 295, 24 Cal. Rptr.2d 467, 861 P.2d 1153 (the duty to defend "turns upon those facts known by the insurer at the inception of a third party lawsuit" (internal quotations omitted)); *CNA Casualty of Cal.*, 176 Cal.App.3d at 605, 222 Cal.Rptr. 276 ("An insurer's duty to defend must be analyzed and determined on the basis of any potential liability arising from facts available to the insurer from the complaint or other sources available to it at the time of the tender of defense"). Therefore, an insurer can be held liable for breaching its duty to defend the insured, even if it is later determined that the policy did not provide coverage for the claim. See *Borg v. Transamerica Ins. Co.*, 47 Cal.App.4th 448, 454, 54 Cal. Rptr.2d 811 (1996) ("An insurer may have a duty to defend even when it ultimately has no obligation to indemnify, either because no

damages are awarded in the underlying action against the insured or because the actual judgment is for damages not covered under the policy"); see also *Wausau Underwriters Ins. Co. v. Unigard Security Ins. Co.*, 68 Cal. App.4th 1030, 1033, 80 Cal.Rptr.2d 688 (1998) ("Years after the defense tender, the action was terminated by a stipulated judgment relating wholly to on-site contamination. That fact does not retrospectively establish that the tenant-insureds had no exposure to a recovery for off-site contamination at the earlier time of tender. Whether there was, or was not, off-site contamination was unknown at the time of tender. The defense duty issue concerns whether the tenant-insureds faced potential liability covered by the policies, not whether that liability ever actually materialized" (footnote omitted)); *Mullen v. Glens Falls Ins. Co.*, 73 Cal.App.3d 163, 173–74, 140 Cal.Rptr. 605 (1977) ("... [M]ay an insurance company, without making an investigation of any kind, deny an insured a defense at a time when it has reason to believe that there is potential liability under the insurance policy, and then rely upon the results of the personal injury lawsuit and subsequent factors to prove that there was in reality no potential liability in the first instance? ... We believe that public policy alone mandates a negative answer to the question; otherwise an insurance carrier could refuse to defend its insured on

court must therefore interpret these provisions and determine whether they absolved defendants of the duty to defend Hondo in the Underlying Action. See *Watts Industries, Inc. v. Zurich Am. Ins. Co.*, 121 Cal.App.4th 1029, 1046, 18 Cal. Rptr.3d 61 (2004) ("Even if there is a possibility of covered damage to property under the CGL coverage provisions, coverage may be defeated by policy exclusions").

## 2. Absolute Earth Movement Exclusion

The "absolute earth movement exclusion" in the Clarendon Policies states, in part:

> **"Bodily injury or property damage** claimed, in whole or in part, to arise from or be aggravated by, or claimed to result from or be the consequence of earth movement, whether the earth movement is combined with any other cause.... This exclusion applies regardless of the cause or causes of the earth movement and includes defects or negligence in design, construction or materials, or any other event, conduct or misconduct which may have or is claimed to have precipitated, caused or acted jointly, concurrently, or in sequence with earth movement in causing the **bodily injury** or **property damage**.... Notwithstanding any provision of this policy to the contrary, where any claim or suit is based in whole or in part upon earth movement, as set forth above, the Company shall have the right, but not the obligation, to defend such lawsuit. The Company shall reimburse the insured upon the conclusion or resolution of the claim or **suit**, based upon the proportion of damages covered by the policy to damages excluded herein." [70]

Citing this exclusion, defendants contend they had no duty to defend Hondo because the Underlying Action was based, at least in part, on claims of earth movement. They point to the allegation in the complaint that "[t]he defects include, without limitation and to various degrees on the plaintiffs' respective residences, the following: ... faulty soil compaction, faulty existing underlying soils and expansive soils resulting in soil movement and damage to the structures...." [71]

USF does not dispute that the Underlying Action included "claims based in whole or in part upon earth movement." [72] It argues, however, that the absolute earth

---

the slightest provocation and then resort to hindsight for the justification. Furthermore, a contrary holding would force the insured to finance his own investigation and the defense of the lawsuit, and then to seek reimbursement in a second lawsuit against the insurance company. This, in turn, could not only impose an undue financial burden on persons who have purchased insurance protection, but it could deprive them of the expertise and resources available to insurance carriers in making prompt and competent investigations as to the merits of lawsuits filed against their insureds"). Thus, this argument by defendants is without merit.

**70.** Fact Stip., Exh. 5 at 3 (Clarendon National Policy), Exh. 6 at 3 (Clarendon America Policy). The absolute earth movement exclusion

only applies to bodily injury or property damage included in the "Products–Completed Operation Hazard." Neither party disputes that the property damage claimed in the Underlying Action falls within the "Products–Completed Operation Hazard" provision of defendants' Policies.

**71.** Behar Decl., Exh. O (Complaint for Damages, ¶ 15), Exh. P (First Amended Complaint for Damages, ¶ 15), Exh. Q (Second Amended Complaint for Damages, ¶ 15), Exh. R (Third Amended Complaint for Damages, ¶ 15), Exh. S (Fourth Amended Complaint for Damages, ¶ 15), Exh. T (Fifth Amended Complaint for Damages, ¶ 15).

**72.** Defs.' Facts, ¶ 17; Pl.'s Genuine Issues, ¶ 17.

movement exclusion did not eliminate defendants' duty to defend because expert reports revealed that only eight of the 127 homes at issue in the Underlying Action had damage caused by earth movement.[73] USF also notes that the complaint listed soil movement as a separate defect, and did not allege that earth movement caused or contributed to other purported defects in the homes.[74]

 Under California law, a defense duty is presumed unless it is "excluded by clear and unambiguous language." *Maryland Casualty Co. v. Nationwide Ins. Co.*, 65 Cal.App.4th 21, 30, 76 Cal.Rptr.2d 113 (1998); see *id.* at 31, 76 Cal.Rptr.2d 113 ("Under Civil Code section 2778, subdivision 4, a defense obligation is implied in all indemnity agreements 'unless a contrary intention appears,'" citing CAL. CIV. CODE § 2778; *Save Mart Supermarkets v. Underwriters*, 843 F.Supp. 597, 602 (N.D.Cal.1994); DiMugno & Glad, CAL. INSURANCE LAW HANDBOOK (1997) §§ 46.01, 46.18(25), pp. 785, 860.) To narrow its defense duty, an insurer must make the exclusion "conspicuous, plain and clear," so that the insured is put on reasonable notice of the limitation. *Gray*, 65 Cal.2d at 273, 54 Cal. Rptr. 104, 419 P.2d 168; see *Save Mart Supermarkets*, 843 F.Supp. at 603 ("The duty to defend must be 'negated by language clear enough to meet the requirement of *Gray v. Zurich* ... that "any exception to the performance of the underlying obligation must be so stated as clearly to apprise the insured of its effect,"'" quoting *Mt. Hawley Ins. Co. v. Federal Savings & Loan Ins. Corp.*, 695 F.Supp. 469, 474 (C.D.Cal.1987)). As the California Su-

preme Court confirmed in *MacKinnon v. Truck Ins. Exchange*, 31 Cal.4th 635, 3 Cal.Rptr.3d 228, 73 P.3d 1205 (2003):

" ... [I]nsurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured, [whereas] ... exclusionary clauses are interpreted narrowly against the insurer. [A]n insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear. As we have declared time and again any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect. Thus, the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language. The exclusionary clause must be conspicuous, plain and clear. This rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded. The burden is on the insured to establish that the claim is within the basic scope of coverage and on the insurer to establish that the claim is specifically excluded" (internal quotations and citations omitted). *Id.* at 648, 3 Cal.Rptr.3d 228, 73 P.3d 1205.

 Defendants' absolute earth movement exclusion falls short of this standard. The exclusions to coverage set forth in the Clarendon National and Clarendon America policies comprise slightly more than six pages of text. The absolute earth movement exclusion appears on the third of these pages, four pages after the general insuring clauses. It is the *only* exclusion in the Policies that contains any language altering the defense obligation set forth in the insuring clauses, and there is no head-

---

**73.** Pl.'s Opp. at 18; see Defs.' Facts, ¶ 17; Pl.'s Genuine Issues, ¶ 17.

**74.** *Id.*

ing or language in the Policies that puts the insured on notice of this fact. The relationship between the statement of the duty to defend found in the insuring clauses, and the limitation on that duty inserted in the absolute earth movement exclusion, therefore, is not plain and conspicuous. See *Gray*, 65 Cal.2d at 272, 54 Cal.Rptr. 104, 419 P.2d 168 ("This clause is not 'conspicuous' since it appears only after a long and complicated page of fine print, and is itself in fine print; its relation to the remaining clauses of the policy and its effect are surely not 'plain and clear' ").[75]

Additionally, the scope of the exclusion's limitation on the duty to defend is ambiguous. The exclusion states that "where any claim or suit is based in whole or in part on earth movement," the insurers will have the right, but not the obligation, to defend the "lawsuit." "Claim" and "suit" are defined terms; "suit" means "a civil proceeding in which damage because of bodily injury [or] property damage ... to which this insurance applies are alleged." "Claim" means "a request or demand received by any insured ... for money ..., including the service of suit ... against any insured."[76] Clarendon National and Clarendon America contend that under the absolute earth movement exclusion, they have no duty to defend if the underlying complaint contains an allegation of earth movement, whether or not that allegation concerns the insured or some other defendant. The reference to "claim or suit" can be read more restrictively, however, to mean that the insurers have no duty to defend a lawsuit if it includes an allegation

that property damage *caused by the insured* resulted, in whole or in part, from earth movement.

■ This narrower interpretation is consistent with the Policies' definition of "claim" as a demand or suit "against [the] insured." It is also consistent with the definition of "suit," which incorporates the insuring clauses of the Policies. As these clauses makes clear, the insurers undertake to "pay [only] those sums that *an insured* becomes legally obligated to pay for damages for bodily injury or property damage to which this insurance applies," and to "defend any suit" seek seeking those damages.[77] The mere fact that other defendants are joined with the insured in a single lawsuit, and that they may have caused damage involving earth movement, cannot absolve the insurers from providing the insured a defense so long as the insured's work did not result in damage caused, in whole or in part, by earth movement. Stated differently, where multiple defendants are named in a single lawsuit, and multiple types of damage are alleged, an insurer can invoke the absolute earth movement exclusion to deny a defense only if it is clear from the allegations of the complaint and other information in its possession that the damage caused by the insured's work was also caused in whole or in part by earth movement. See *Community Redevelopment Agency of City of Los Angeles v. Aetna Casualty and Surety Co.*, 50 Cal.App.4th 329, 337, 57 Cal.Rptr.2d 755 (1996) (Croskey, J.) ("United disputes that the subsidence exclusion [in Scotts-

---

**75.** In their motion, defendants argue that the "excess defense" provision "is conspicuously contained in the Insuring Agreement, on the first page of the policy, and not in a separate endorsement at the end of the policy." (Defs.' Mot. at 23.) They do not make a similar argument respecting the absolute earth movement exclusion.

**76.** Fact Stip., Exh. 5 at 16, 18 (Clarendon National Policy), Exh. 6 at 18, 20·(Clarendon America Policy).

**77.** Fact Stip., ¶ 6, Exh. 5 at 3 (Clarendon National Policy), Exh. 6 at 3 (Clarendon America Policy) (emphasis added).

dale's policy] precludes a defense duty because there were other 'claims' of defective construction of improvements asserted in the underlying damage actions. Although ultimately found to be without merit by the trial court (all of the damages suffered by homeowners were found to be due to subsidence), the allegation of those claims was sufficient to raise a potential of coverage and therefore a duty to defend. Th[is] ... argument[ ] may have some merit. However, we do not reach [it]....").

Such an interpretation is supported by the fact that the absolute earth movement exclusion applies only to property damage that is included in the Products–Completed Operations Hazard. The Products–Completed Operations Hazard includes all bodily injury and property damage "arising out of your product or your work." [78] "Your work" means, *inter alia,* "[w]ork or operations performed by you or on your behalf." [79] "You" refers to the named insured, i.e., Hondo.[80] Because the exclusion is limited by its terms to work performed by the named insured, the limitation on the insurers' defense obligations it includes must be read to extend only to property damage caused by that work and also by earth movement.

 Such an interpretation is consistent with the objectively reasonable expectations of the insured. See *Bay Cities Paving & Grading, Inc.,* 5 Cal.4th at 867, 21 Cal.Rptr.2d 691, 855 P.2d 1263; *A.B.S.,* 34 Cal.App.4th at 1478, 41 Cal.Rptr.2d 166. An insured might reasonably anticipate, based on the absolute earth movement exclusion, that if *it* is sued for property damage caused in part by soil movement,

the insurer will have no duty to defend that suit. An insured would *not* reasonably expect that its entitlement to a defense would disappear any time it is joined in a multi-defendant suit where a third-party claimant asserts a claim involving earth movement against *some* defendants, but not specifically against it. Compare *Garamendi v. Golden Eagle Ins. Corp.,* No. A099011, 2003 WL 21030255, *1–3 (Cal.App. May 8, 2003) (Unpub.Disp.) (finding that a similar earth movement exclusion absolved an insurer of all defense and indemnity obligations because "[t]he collapse was attributed to inadequate compaction of the underground utility trenches, including those constructed by" the insured).

 The homeowners in the Underlying Action did not allege that any damage caused by earth movement was attributable to Hondo's work, nor did they allege that the property damage resulting from Hondo's work had been caused or aggravated by earth movement. Indeed, from the face of the complaint, it is impossible to determine whether the "framing, siding and structural defects" alleged have any relation to the "[f]aulty soil compaction, faulty existing underlying soils and expansive soils resulting in soil movement and damage to the structures" about which the homeowners complain. Nothing in the summary judgment record suggests that Clarendon National and Clarendon America had additional information linking the two types of damage at the time they declined to defend the Underlying Action. Therefore, the court concludes that the absolute earth movement exclusion did not

---

**78.** Fact Stip., Exh. 5 at 18 (Clarendon National Policy), Exh. 6 at 20 (Clarendon America Policy).

**79.** *Id.,* Exh. 5 at 19 (Clarendon National Policy), Exh. 6 at 21 (Clarendon America Policy).

**80.** *Id.,* Exh. 5 at 3 (Clarendon National Policy), Exh. 6 at 3 (Clarendon America Policy).

relieve defendants of their duty to defend Hondo in the Underlying Action.

### 3. Excess Defense Provision

■ The insuring clauses of the Clarendon Policies provide: "**Our** duty to defend is excess over and shall not contribute where the **insured** has any other insurance under which, but for the existence of this Policy, any other insurer is obligated to provide a defense."[81] USF contends that this is essentially an "excess" or "other insurance" provision that cannot be given effect under California law.[82] It argues that *Century Surety Co. v. United Pacific Insurance Co.*, 109 Cal.App.4th 1246, 135 Cal.Rptr.2d 879 (2003), and *Travelers Casualty Surety Co. v. Century Surety Co.*, 118 Cal.App.4th 1156, 13 Cal.Rptr.3d 526 (2004), clearly hold that where, as here, two or more primary CGL policies contain identical "excess insurance" language, the provisions cancel one another out, and all insurers are required to contribute to defense of the insured.[83] Thus, USF asserts, to permit defendants to use this "excess insurance" provision as a "escape clause" to avoid their defense duty and contribution obligation would contravene California law.

Clarendon National and Clarendon America counter that the provision is not an "excess insurance" clause, but an "excess defense" clause.[84] They argue that *Century Surety Co.* and *Travelers Casualty & Surety Co.* are inapplicable because, unlike the "excess insurance" provision at issue in those cases, the provision in their Policies does not affect the scope of coverage or their duty to indemnify the insured for covered losses.[85]

In *Century Surety Co.*, a group of homeowners sued the general contractor that had constructed their houses. *Century Surety Co.*, 109 Cal.App.4th at 1250–51, 135 Cal.Rptr.2d 879. The general contractor filed a cross-complaint against several of the subcontractors involved in the construction, including County Line Framing, Inc. County Line tendered defense of the suit to four commercial general liability insurers, which provided successive coverage over a five-year period. *Id.* at 1250, 135 Cal.Rptr.2d 879. Three of the insurers accepted the tender, defended County Line, and eventually settled the matter. *Id.* The fourth insurer, Century Surety Company, rejected the tender, asserting that it had no duty to defend because its coverage was "excess" to that provided under the other policies. *Id.*

The four policies contained nearly identical insuring language. Each obligated the insurer to "pay those sums the insured becomes legally obligated to pay as damages because of … 'property damage' to which this insurance applies," and to defend any "suit" seeking such damages. *Id.* at 1251, 135 Cal.Rptr.2d 879. The principal difference between Century's policy and the other insurers' coverage was the "other insurance" provision. The policies of the three defending companies contained a standard "other insurance" provision, which stated:

"4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A and B of this Coverage Part, our obligations are limited as follows:

---

**81.** Fact Stip., Exh. 5 at 3 (Clarendon National Policy), Exh. 6 at 3 (Clarendon America Policy).

**82.** Pl.'s Mot. at 15–16.

**83.** *Id.* at 16.

**84.** Defs.' Mot. at 21–26.

**85.** *Id.*

a. Primary Insurance

This insurance is primary.... If this insurance is primary, our obligations are not affected unless any of the other insurance is primary. Then, we will share with that other insurance by the method described in c. below....

c. Method of Sharing. If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach, each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first. If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers." *Id.* at 1251–52, 135 Cal.Rptr.2d 879.

Century's policy, by contrast, included an endorsement that explicitly replaced the standard "other insurance" language with the following provision:

"4. Other Insurance

If other valid and collectible insurance is available to any insured for a loss we cover under the Coverage A or B of this Coverage Part, then this insurance is excess of such insurance and we have no duty to defend any claim or 'suit' that any other insurer has a duty to defend." *Id.* at 1252, 135 Cal.Rptr.2d 879.

Century argued that this provision clearly nullified any potential coverage under its policy and absolved it of the duty to defend County Line in the underlying action.

Writing for the court, Justice Croskey concluded that Century's "excess insurance" provision was contrary to public policy, since it permitted a *primary* insurer

"to make a seemingly ironclad guarantee of coverage, only to withdraw that coverage (and thus escape liability) in the presence of other insurance." *Id.* at 1256, 135 Cal.Rptr.2d 879 (quoting *Commerce & Industry Ins. Co. v. Chubb Custom Ins. Co.,* 75 Cal.App.4th 739, 740, 89 Cal.Rptr.2d 415 (1999)); see also *id.* ("Whatever may be said about the merits of Century's attempt to limit its liability to 'excess' coverage, it is clear that it was not, and it cannot claim to be, a true excess or secondary insurer as we have described that term"). The court also held that Century's "excess insurance" provision and the "other insurance" provisions in the remaining policies were "mutually repugnant" such that it could not enforce Century's policy without contravening the others. *Id.* at 1260, 135 Cal.Rptr.2d 879. For these reasons, the court concluded that the appropriate course was "to ignore all of the clauses and require some equitable pro rata apportionment" amongst all four insurers. *Id.;* see also *Signal Companies,* 27 Cal.3d at 369, 165 Cal.Rptr. 799, 612 P.2d 889 ("The reciprocal rights and duties of several insurers who have covered the same event do not arise out of contract, for their agreements are not with each other.... Their respective obligations flow from equitable principles designed to accomplish ultimate justice in the bearing of a specific burden. As these principles do not stem from agreement between the insurers their application is not controlled by the language of their contracts with the respective policy holders"); *Commerce & Industry Ins. Co.,* 75 Cal.App.4th at 749, 89 Cal.Rptr.2d 415 ("[E]quity overrides the terms of the insurance policies").

In *Travelers Casualty & Surety Co.,* a second California appellate court invalidated Century's "excess insurance" provision as an "escape clause" and equitably apportioned a loss between the successive insur-

ers. *Travelers Casualty & Surety Co.,* 118 Cal.App.4th at 1159–64, 13 Cal.Rptr.3d 526. Citing language in *Dart Industries, Inc. v. Commercial Union Insurance Co.,* 28 Cal.4th 1059, 1079–80, 124 Cal.Rptr.2d 142, 52 P.3d 79 (2002), the court predicted that, when presented with the issue, the California Supreme Court would reach the same conclusion. See *id.* at 1162, 124 Cal. Rptr.2d 142, 52 P.3d 79 (quoting *Dart Industries,* 28 Cal.4th at 1079–80, 124 Cal. Rptr.2d 142, 52 P.3d 79) ("Historically, 'other insurance' clauses were designed to prevent multiple recoveries when more than one policy provided coverage for a particular loss. On the other hand, 'other insurance' clauses that attempt to shift the burden away from one primary insurer wholly or largely to other insurers have been the objects of judicial distrust. [P]ublic policy disfavors 'escape' clauses, whereby coverage purports to evaporate in the presence of other insurance.... [T]he modern trend is to require equitable contributions on a pro rata basis from all primary insurers regardless of the type of 'other insurance' clause in their policies" (internal quotations and citations omitted)).

The "excess defense" clause in the Clarendon Policies differs from the "excess insurance" provision analyzed in *Century Surety Co.* and *Travelers Casualty & Surety Co.* in that it does not affect the scope of coverage. While the Century provision purported to make both coverage and the duty to defend "excess" where there was other applicable primary insurance, the Clarendon provision leaves coverage intact, and purports to eliminate only the insurers' defense obligation. Despite this difference, the reasoning of *Century Surety Co.* and *Travelers Casualty & Surety Co.* is equally applicable here. The excess defense provision found in the Clarendon Policies is a type of "escape

clause"—albeit a narrower one than an excess insurance clause—since it allows a primary insurer "to make a seemingly ironclad guarantee" that it will defend the insured, "only to withdraw that [guarantee] ... in the presence of other insurance." *Century Surety Co.,* 109 Cal. App.4th at 1256, 135 Cal.Rptr.2d 879. An excess defense clause therefore deprives the insured of the benefit of its bargain. As the California appellate court held in *Fireman's Fund Ins. Co. v. Maryland Casualty Co.,* 65 Cal.App.4th 1279, 77 Cal. Rptr.2d 296 (1998):

"Where two or more primary insurers' policies contain 'other insurance' clauses purporting to be excess to each other, the conflicting clauses will be ignored and the loss prorated among the insurers on the ground the insured would otherwise be deprived of protection. Thus, although a true excess insurer— one that is solely and explicitly an excess insurer providing only secondary coverage—has no duty to defend or indemnify until all the underlying primary coverage is exhausted or otherwise not on the risk, primary insurers with conflicting excess 'other insurance' clauses can have *immediate defense obligations.*" *Id.* at 1304, 77 Cal.Rptr.2d 296 (citations omitted and emphasis added).

Such a result is appropriate since "so far as the insured is concerned, the duty to defend may be as important as the duty to indemnify." *Buss v. Superior Court,* 16 Cal.4th 35, 45, 65 Cal.Rptr.2d 366, 939 P.2d 766 (1997); see also *Montrose I,* 6 Cal.4th at 295–96, 24 Cal.Rptr.2d 467, 861 P.2d 1153 ("The insured's desire to secure the right to call on the insurer's superior resources for the defense of third party claims is, in all likelihood, typically as significant a motive for the purchase of insurance as is the wish to obtain indemnity for possible liability. As a consequence, California courts have been consistently solici-

tous of insureds' expectations on this score"); *Woodliff v. California Insurance Guarantee Ass'n.*, 110 Cal.App.4th 1690, 1699, 3 Cal.Rptr.3d 1 (2003) (citing *Buss* ). "An insured buys liability insurance in large part to secure a defense against all claims potentially within policy coverage, even frivolous claims unjustly brought." *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal.4th 1076, 1086, 17 Cal.Rptr.2d 210, 846 P.2d 792 (1993). It is just as inequitable to permit an insurer to escape its bargained-for obligation to provide this type of protection to the insured as it is to permit the insurer to avoid its obligation to indemnify against an ultimate loss.[86] An excess defense clause is also inequitable from the standpoint of other insurers who have undertaken to defend the insured. Like excess insurance provisions, excess defense clauses essentially "attempt to shift the burden away from one primary insurer wholly or largely to other insurers," and must thus "be[ ] the objects of judicial distrust." *Dart Industries*, 28 Cal.4th at 1079–80, 124 Cal.Rptr.2d 142, 52 P.3d 79.

The California Supreme Court has not yet squarely addressed whether excess defense provisions are unenforceable as a

matter of public policy. Based on *Dart Industries*, 28 Cal.4th at 1079–80, 124 Cal. Rptr.2d 142, 52 P.3d 79, and the California appellate decisions invalidating excess insurance provisions, however, the court concludes that the California Supreme Court would hold that the excess defense provisions in the USF and Clarendon Policies are escape clauses that are against public policy. For this reason, and because the identical provisions in the USF and Clarendon Policies are mutually irreconcilable,[87] the court concludes that the proper course is to ignore the excess defense clauses and equitably apportion defense costs among the three insurers. See *Travelers Casualty & Surety Co.*, 118 Cal. App.4th at 1160, 13 Cal.Rptr.3d 526 ("While generally, an insurer's coverage terms will be honored if possible, there are exceptions to this rule.... One exception arises where the policies of two or more insurers of a common insured, providing primary coverage for the same risk, contain conflicting 'other insurance' clauses ... if one insurer pays more than its share of the loss or defense costs without participation from the other insurer or insurers, a right to contribution arises.... "The pur-

**86.** This is particularly true where, as here, more than one of the insurers obligated to defend included an excess defense provision in its policy. Had USF and defendants been the only insurers on the risk, and had USF, like defendants, elected not to defend based on its excess defense provision, Hondo would have been left to pay for its own defense in the Underlying Action, and been denied one of the primary benefits of the insurance coverage for which it paid.

**87.** The Golden Bear Policy contains an "other insurance" clause, which provides that when its coverage is primary, and "the other insurance is also primary," it "will share with all that other insurance by the [following] method: ... If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach, each insurer contributes equal amounts until it has

paid its applicable limit of insurance or none of the loss remains, whichever comes first. If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance by all insurers." (Fact Stip., Exh. 3 (Golden Bear Policy).) Although it does not specify a single method of contribution, Golden Bear's "other insurance" clause requires that defense costs be apportioned in some way among all primary insurers that are on the risk. Contrary to defendants' assertion, therefore, it is clear that the "other insurance" clause in Golden Bear's Policy directly conflicts with the "excess defense" provisions in the USF and Clarendon Policies. (See Defs.' Mot. at 20–21.)

pose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others,'" quoting *Fireman's Fund Ins. Co.*, 65 Cal.App.4th at 1293, 77 Cal.Rptr.2d 296); *Commerce & Industry Ins. Co.*, 75 Cal.App.4th at 744–45, 89 Cal. Rptr.2d 415 (holding that where two insurance policies have the same "excess only" clauses, the costs of defense should be prorated because "[i]f given effect [the] competing clauses would strand an insured between insurers disclaiming coverage in a manner reminiscent of Alphonse and Gaston").

## 4. Equitable Contribution

■ "[T]he right to equitable contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss, or defended the action without participation by the others." *Truck Ins. Exchange*, 79 Cal.App.4th at 974, 94 Cal.Rptr.2d 516. The purpose of the rule "is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others." *Fireman's Fund Ins. Co.*, 65 Cal. App.4th at 1293, 77 Cal.Rptr.2d 296. Equitable contribution is "predicated on the common sense principle that where multiple insurers or indemnitors share equal contractual liability for the primary indemnification of a loss or the discharge of an obligation, the selection of which indemnitor is to bear the loss should not be left to the often arbitrary choice of the loss claimant, and no indemnitor should have any incentive to avoid paying a just claim in the hope the claimant will obtain full pay-

ment from another coindemnitor." *Id.* at 1295, 77 Cal.Rptr.2d 296.

Citing *Centennial Insurance Co. v. United States Fire Ins. Co.*, 88 Cal. App.4th 105, 105 Cal.Rptr.2d 559 (2001), USF contends that defense costs should be divided on an "equal share" basis, with each of the three insurance companies paying one-third of the total costs.[88] Defendants argue that the "equal shares" method of allocation does not necessarily apply; they do not identify an alternative formula that the court should employ, however.[89]

■ There is no fixed rule for allocating defense costs among primary insurers covering the same loss. California courts consider "the varying equitable considerations which may arise ... and which depend on the particular policies of insurance, the nature of the claim made, and the relation of the insured to the insurers." *Signal Companies*, 27 Cal.3d at 369, 165 Cal.Rptr. 799, 612 P.2d 889; see also *Fireman's Fund Ins. Co.*, 65 Cal.App.4th at 1306–07, 77 Cal.Rptr.2d 296; *Stonewall Ins. Co. v. City of Palos Verdes Estates*, 46 Cal.App.4th 1810, 1853–54 n. 14, 54 Cal. Rptr.2d 176 (1996); *Armstrong World Industries, Inc.*, 45 Cal.App.4th at 52–53, 52 Cal.Rptr.2d 690; *CNA Casualty of Cal.*, 176 Cal.App.3d at 619–20, 222 Cal.Rptr. 276. Thus, the exact allocation is a decision that ultimately rests in the discretion of the court.

*Centennial Insurance Co.* is not to the contrary. There, the California appellate court held:

"In choosing the appropriate method of allocating defense costs among multiple liability insurance carriers, each insuring the same insured, a trial court must determine which method of allocation will most equitably distribute the obli-

88. Pl.'s Mot. at 20.

89. Defs.' Opp. at 19.

gation among the insurers 'pro rata in proportion to their respective coverage of the risk,' as 'a matter of distributive justice and equity.' As such, the trial court's determination of which method of allocation will produce the most equitable results is necessarily a matter of its equitable judicial discretion." *Id.* at 111–12, 105 Cal.Rptr.2d 559.[90]

The court held that the trial court had not abused its discretion by employing the "time on the risk" method of allocation instead of an "equal shares" approach. *Id.* at 112, 105 Cal.Rptr.2d 559. Specifically, it concluded that the "time on the risk" method was more equitable under the facts of the underlying case because one of the insurers had only covered the mutual insured for a period of less than six months, "only a small fraction of the total insurance coverage period of four and one-half years provided" to the insured by the other three insurance companies. *Id.* at

113, 105 Cal.Rptr.2d 559. To ignore the relative periods of coverage and require each insurer to pay the same amount of defense costs, the court stated, "would have been patently arbitrary and inequitable." *Id.* at 113–14, 105 Cal.Rptr.2d 559.

▪ Similarly here, it would be inequitable to apportion defense costs in equal shares because Clarendon National insured Hondo for only three months,[91] while USF and Clarendon America each provided coverage for twelve months.[92] Given the particular circumstances of this case, the court finds that allocation according to "time on the risk" would be more equitable and "accomplish substantial justice" among the parties.[93] *Fireman's Fund Ins. Co.*, 65 Cal.App.4th at 1293, 77 Cal.Rptr.2d 296. It is undisputed that USF incurred a total of $117,429.81 in attorneys' fees, costs, and expert fees defending Hondo in the Underlying Action.[94] Apportioning that expense

**90.** The *Centennial* court identified six methods that California courts have used to apportion defense and indemnity costs:

"(1) apportionment based upon the relative duration of each primary policy as compared with the overall period of coverage during which the 'occurrences' 'occurred' (the 'time on the risk' method); (2) apportionment based upon the relative policy limits of each primary policy (the 'policy limits' method); (3) apportionment based upon both the relative durations and the relative policy limits of each primary policy, through multiplying the policies' respective durations by the amount of their respective limits so that insurers issuing primary policies with higher limits would bear a greater share of the liability per year than those issuing primary policies with lower limits (the 'combined policy limit time on the risk' method); (4) apportionment based upon the amount of premiums paid to each carrier (the 'premiums paid' method); (5) apportionment among each carrier in equal shares up to the policy limits of the policy with the lowest limits, then among each carrier other than the one issuing the policy with the lowest limits in equal shares up to the policy limits of the policy with the next-

to-lowest limits, and so on in the same fashion until the entire loss has been apportioned in full (the 'maximum loss' method); and (6) apportionment among each carrier in equal shares (the 'equal shares' method)." *Id.* at 112–13, 105 Cal.Rptr.2d 559 (citations omitted).

**91.** Fact Stip., ¶ 3(B) (modified by Joint Notice of Errata to Stipulation of Facts in Support of Cross–Motions for Summary Judgment and/or Adjudication); see *id.*, ¶ 5; see also Defs.' Facts, ¶ 3(B); Pl.'s Genuine Issues, ¶ 3(B); Pl.'s Facts, ¶ 2.0; Defs.' Genuine Issues, ¶ 2.0.

**92.** Fact Stip., ¶¶ 3(A), 3(C); see Defs.' Facts, ¶¶ 3(A), 3(C); Pl.'s Genuine Issues, ¶¶ 3(A), 3(C); Pl.'s Facts, ¶¶ 1.0, 3.0; Defs.' Genuine Issues, ¶¶ 1.0, 3.0.

**93.** Because the USF, Clarendon America, and Clarendon National Policies have identical per occurrence policy limits, the "time on the risk" method yields the same ratio as the "combined time on the risk" method of apportionment.

**94.** Pl.'s Facts, ¶¶ 6.0–6.3; Defs.' Genuine Issues, ¶¶ 6.0–6.3; Defs.' Facts, ¶ 16(A); Pl.'s

according to the insurers' time on the risk, the court concludes that Clarendon National is liable for 1/9 of the defense fees and costs, or $13,047.75. Clarendon America is liable for 12/27 of the defense fees and costs, or $52,191.03.

## III. CONCLUSION

Having reviewed the record supporting the cross-motions for summary judgment, the court finds that there are no triable issues of fact, and that defendants are entitled to judgment as a matter of law on plaintiff's second and fourth causes of action. The court further finds that plaintiff is entitled to summary judgment on its first and third causes of action.

The court will enter a judgment declaring that:

1. Defendants had no duty to indemnify the parties' mutual insured, and should not, in equity, be required to contribute to indemnification of the insured in the Underlying Action.

2. Defendants had a duty to defend the parties' mutual insured in the Underlying Action. Clarendon National must pay USF $13,047.75 and Clarendon America must pay USF $52,191.03, as their respective shares of the fees and costs incurred in the defense of the insured in the Underlying Action.

---

Genuine Issues, ¶ 16(A). Defendants argue that they should not be compelled to pay a share of USF's defense costs because their Policies limit their obligation to pay for a defense to counsel selected by them. (Defs.' Mot. at 28.) It is well-settled that an insurer that declines to defend waives its right to challenge the reasonableness of defense costs.

See *Am. Star Ins. Co. v. Ins. Co. of the West*, 232 Cal.App.3d 1320, 1332–33, 284 Cal.Rptr. 45 (1991). Having rejected Hondo's tender of defense, defendants cannot now dispute the reasonableness of the defense costs incurred on the basis that their Policies give them a right to retain counsel of their choice.